893 F.Supp. 1320 (1994)
Louis ARMSTRONG, et al., Plaintiffs,
v.
William A. ALLAIN, et al., Defendants.
Jimmie C. ROBINSON, et al., Plaintiffs,
v.
Doug STEWART, et al., Defendants.
Civ. A. Nos. J86-0817(L), J91-0687(L).
United States District Court, S.D. Mississippi, Jackson Division.
March 4, 1994.
*1321 Ellis Turnage, Cleveland, MS; J. Brad Pigott, U.S. Attorney's Office, Jackson, MS, for plaintiffs.
Robert E. Sanders, T. Hunt Cole, Jr., Mississippi Atty. General's Office, Jackson, MS; W. David Watkins, Brunini, Grantham, Grower & Hewes, Jackson, MS, for defendants.

MEMORANDUM OPINION AND ORDER
TOM S. LEE, District Judge.
Plaintiffs, adult black registered voters in Mississippi, filed this action for declaratory and injunctive relief pursuant to Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments to the United States Constitution, contending that Mississippi Code Ann. § 37-59-17, which requires that school bond referenda be passed by a 60% majority vote, rather than a simple majority, results in an abridgement of the voting effectiveness of black voters in Mississippi.[1] Plaintiffs allege *1322 that black voters vote cohesively in support of such referenda whereas white voters vote in opposition to such referenda in sufficient numbers usually to defeat them in light of the 60% requirement, and that these facts, when considered in light of the totality of the circumstances and the history of discrimination as to voting and public educational matters within Mississippi, establish a violation of § 2. They further charge a constitutional violation, alleging that a motivating factor in the legislative enactment and maintenance of the 60% standard has been racial animus.
Mississippi Code Ann. § 37-59-11 (1972) addresses the subject of calling of elections on the issuance of school bonds, and subsequent statutes set forth the procedures to attend such elections. The statute at issue in this case, Miss.Code Ann. § 37-59-17, addresses the results of elections on school bond referenda and provides:
When the results of the election on the question of the issuance of such bonds shall have been canvassed by the election commissioners of such county or municipality, and certified by them to the school board of the school district, it shall be the duty of such school board to determine and adjudicate whether or not three-fifths ( 3/5 ) of the qualified electors who voted in such election voted in favor of the issuance of such bonds. Unless three-fifths ( 3/5 ) of the qualified electors who voted in such election shall have voted in favor of the issuance of such bonds, then such bonds shall not be issued. Should three-fifths ( 3/5 ) of the qualified electors who vote in such election vote in favor of the issuance of such bonds, then the school board of such school district shall issue such bonds, either in whole or in part, within two (2) years from the date of such election, or within two (2) years after the final favorable termination of any litigation affecting the issuance of such bonds, as such school board shall deem best.

THE STATUTORY CLAIM
Section 2 of the Voting Rights Act, as amended, provides:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b)(f)(2) of this section.
(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Plaintiff's Thesis
Plaintiffs' theory in this case is that the 60% standard imposed by § 37-59-17 causes dilution of the voting weight and effectiveness of any group tending cohesively to vote as "yes," and that it causes impairment of the prospects of electoral success for any cohesive "yes" group, which abridges the effectiveness of any "yes" group at the polls. Next positing that black voters in Mississippi tend cohesively to vote "yes" for school bond referenda, and whites tend to vote as a bloc against school bond issues, plaintiffs conclude that the 60% supermajority requirement *1323 abridges the rights of the black electorate on account of their race, in violation of § 2.

Applicability of Section 2
On a motion for summary judgment preceding the trial of the cause, defendants requested judgment on plaintiffs' § 2 claim, arguing that § 2 does not apply to dilution claims respecting "issue" elections such as that involved in the case at bar. The court rejected defendants' contention then, and now would reiterate, perhaps with more clarity, the basis for its conclusion in this regard. Defendants' position is that § 2 applies only to dilution claims in the context of elections of candidates for office and is inapplicable to dilution claims relating to issue elections. According to defendants, this position derives primarily from the language of § 2 itself, which specifically provides that a violation is established if "it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" (emphasis added). Citing principally Chisom v. Roemer, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), defendants insist that a violation of § 2 is established only if plaintiffs prove both a diminished ability to participate in the election process and an inability to elect representatives of their choice, and they reason that plaintiffs cannot make this latter showing since an issue is not a "representative."
The court concludes that defendants' position that the scope of § 2 is limited to elections of "representatives," while having superficial appeal, lacks merit. Again, § 2 proscribes the imposition or application of any "voting qualification or prerequisite to voting or standard, practice of procedure ... which results in [an] ... abridgement of the right of any citizen of the United States to vote on account of race or color...." Section 14(c)(1) of the Act defines "vote" and "voting" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to ... action required by law prerequisite to voting, ... casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election" (emphasis added). Further, as plaintiffs point out, the United States Attorney General testified, prior to the 1965 enactment of the Voting Rights Act, that "[e]very election in which registered voters are permitted to vote would be covered" under § 2. See Chisom, 501 U.S. at 391-92, 111 S.Ct. at 2362 (quoting Attorney General's testimony from "Hearing on HR 6400 and Other Proposals to Enforce the Fifteenth Amendment to the Constitution of the United States").
The conclusion that § 2 coverage is not limited to elections for representatives but encompasses "issue" elections is also suggested by the Attorney General's interpretation of the "virtually companion" § 5.[2] In regulations describing "changes affecting voting" which are subject to the preclearance requirements of § 5, the scope of a "special election" is said to include any "initiative, referendum, or recall election; or a bond issue election...." 28 C.F.R. § 51.17 (1990). Moreover, these regulations interpret the terms "voting qualification, prerequisite to voting, or standard or practice, or procedure with respect to voting" to include matters which "affect[] the necessity of or methods for offering issues and propositions for approval by referendum." 28 C.F.R. § 51.13(j), as well as "the method for determining the outcome of an election e.g., by requiring a majority vote for election or the *1324 use of a designated post or place system," 28 C.F.R. § 51.13(f).
Recognizing that the Voting Rights Act's definition of "vote" and "voting" purports to extend the coverage of the Act to "issue" elections, referring, as it does, to "propositions for which votes are received in an election," defendants "readily agree" that § 2 applies to the procedural aspects of issue elections, as, for example, the location of polling booths. Defendants insist, though, that the coverage of the Act does not extend to dilution claims such as that alleged by plaintiffs in this case. However, this very view of § 2, i.e., that it provides two distinct types of protection, was squarely rejected in Chisom, the case most heavily relied on by defendants.
Under consideration in Chisom was the scope of § 2 and specifically, whether judicial elections are covered under § 2. The sole subject of dispute was whether "the test for determining the legality of ... a [voting] practice, which was added to the statute in 1982, applie[d] in judicial elections as well as in other elections." Id., 501 U.S. at 391, 111 S.Ct. at 2362. Section 2, as originally enacted, was "largely ... a restatement of the Fifteenth Amendment," and the coverage it afforded was recognized as being coextensive with the coverage of the Fifteenth Amendment. See Mobile v. Bolden, 446 U.S. 55, 60-61, 100 S.Ct. 1490, 1495-97, 64 L.Ed.2d 47 (1980).[3] There were no limitations as to the elections which it would cover. In 1982, Congress amended § 2 in response to the Supreme Court's plurality opinion in Mobile, in which it was held that a § 2 violation required proof of intentional discrimination. The amendment incorporated a "results" test in amended subsection (a), "to make clear that proof of discriminatory intent is not required to establish a violation of § 2,"[4] but further added subsection (b) to provide instruction on how to apply the results test, i.e., "to make clear that application of the results test requires an inquiry into the `totality of the circumstances.'" Chisom, 501 U.S. at 394, 111 S.Ct. at 2363. And this amendment added the language upon which defendants' argument focuses in the case at bar, and which was the focus of the Court's attention in Chisom, i.e., that a violation of § 2 is proved if members of a protected class show that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." The Fifth Circuit had concluded below, Chisom v. Edwards, 839 F.2d 1056 (1988), and in League of United Latin American Citizens Council No. 4434 v. Clements, 914 F.2d 620 (1990) (LULAC II), a later case decided while Chisom was pending appeal, that § 2, as amended, did not apply to judicial elections, reasoning that the statute protected two distinct aspects of voting, "the broad and general opportunity to participate in the political process and the specific one to elect representatives." LULAC II, 914 F.2d at 625 (quoted in Chisom, 501 U.S. at 387, 111 S.Ct. at 2360). Thus, the Fifth Circuit had "[drawn] a distinction between claims involving tests or other devices that interfere with individual participation in an election, on the one hand, and claims of vote dilution that challenge impairment of a group's opportunity to elect representatives of their choice, on the other hand." Chisom, 501 U.S. at 387, 111 S.Ct. at 2360. Amended § 2, the court had reasoned, would continue to apply to judicial elections with respect to claims in the former category, but would exclude claims of dilution in judicial elections from the latter category since the term "representatives" excluded judges.
The Supreme Court flatly rejected this view of § 2, stating:
The LULAC majority assumed that § 2 provides two distinct types of protection for minority voters  it protects their opportunity "to participate in the political *1325 process" and their opportunity "to elect representatives of their choice." See LULAC, 914 F.2d, at 625. Although the majority interpreted "representatives" as a word of limitation, it assumed that the word eliminated judicial elections only from the latter protection, without affecting the former. Id., at 625, 629. In other words, a standard, practice, or procedure in a judicial election, such as a limit on the times that polls are open, which has a disparate impact on black voters' opportunity to cast their ballots under § 2, may be challenged even if a different practice that merely affects their opportunity to elect representatives of their choice to a judicial office may not. This reading of § 2 is foreclosed by the statutory text and by our prior cases.

Id., 501 U.S. at 396-97, 111 S.Ct. at 2365 (emphasis added). The Court went on to explain that under the Voting Rights Act, the opportunity to participate is not severable from the opportunity to elect:
The statute does not create two separate and distinct rights. Subsection (a) covers every application of a qualification, standard, practice or procedure that results in a denial or abridgement of "the right" to vote.... [T]he opportunity to participate and the opportunity to elect [are] inextricably linked.
... Even if the wisdom of Solomon would support the LULAC majority's proposal to preserve claims based on an interference with the right to vote in judicial elections while eschewing claims based on the opportunity to elect judges, we have no authority to divide a unitary claim created by Congress.
Id., 501 U.S. at 396-400, 111 S.Ct. at 2365-66 (citations omitted); see also Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964) (right to vote may be abridged through dilution of voting strength). From these passages, it is clearly seen that defendants' argument, that the "procedural" aspects of elections on school bond referenda are subject to challenge under § 2 "even if a different practice that merely affects their opportunity to elect [the issue] of their choice" is not, is precisely the position repudiated by the Chisom Court, which viewed § 2 as creating a "unitary," rather than divisible claim.
Defendants argue, alternatively it is assumed, that in view of Chisom's "unitary" interpretation of § 2, this court must rule that § 2 excludes from its coverage "all" issue elections. They reason that since Chisom explicitly requires proof by § 2 plaintiffs of both a diminished opportunity to participate in the political process and to elect representatives of their choice, and since plaintiffs in the case at bar are not contending that their ability to elect "representatives" of their choice is impaired but rather are contending that the 60% requirement impairs their ability to pass school bond referenda, i.e., an "issue," then their claims are necessarily excluded from § 2's coverage. In support of this position, defendants point to the following language in Chisom:
The results test mandated by the 1982 amendment is applicable to all claims under § 2. If the word "representatives" did place a limit on the coverage of the Act for judicial elections, it would exclude all claims involving such elections from the protection of § 2. For all such claims must allege an abridgement of the opportunity to participate in the political process and to elect representatives of one's choice.
Id., 501 U.S. at 396, 111 S.Ct. at 2365. Defendants seem to reason that since the use of the phrase "to elect representatives of their choice," as interpreted by Chisom, limits the coverage of § 2 to voting standards, practices and procedures affecting the election of representatives, then this phrase necessarily "exclude[s] all claims involving [issue] elections from the protection of § 2."[5]
Defendants do not appear to dispute the proposition that § 2, prior to the 1982 amendment, covered issue elections. They *1326 apparently agree, as well, that the language of the Voting Rights Act as a whole, including § 2, would logically seem to apply to at least some aspects of issue elections, i.e., the procedural aspects. But defendants insist that since Chisom dictates an "all or nothing" approach in that it holds that categories of elections are either covered or they are not covered, then the only reasonable conclusion is that issue elections are not covered since they do not involve efforts by any minority group to elect "representatives" of their choice.
In concluding that judicial elections are covered by amended § 2, the Chisom Court stressed that Congress' purpose in amending the statute was not to restrict the coverage of the section but rather to expand it. Id., 501 U.S. at 404, 111 S.Ct. at 2368. The Court found it "difficult to believe that Congress, in an express effort to broaden the protection afforded by the Voting Rights Act, withdrew, without comment, an important category of elections from that protection," and thus construed the Act in such a way as to avoid this "anomalous" result. Id., 501 U.S. at 404, 111 S.Ct. at 2368.[6] The Court, too, sought to avoid the "anomal[y]" that would result if § 2 were construed as inapplicable to judicial elections when § 5 clearly applied to that category of elections. Id., 501 U.S. at 401-02, 111 S.Ct. at 2367. In this case, acceptance of the position urged by defendants would result in such anomalies. And the Court emphasized the "broad remedial purpose" of the original enactment of the Voting Rights Act of eradicating discrimination in voting throughout the country, and stressed that in view of that purpose, the Act was to be interpreted "in a manner that provides `the broadest possible scope' in combatting racial discrimination." Id., 501 U.S. at 404, 111 S.Ct. at 2368 (quoting Allen v. State Board of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969). The reference in § 2 to elections of representatives presents a possible ambiguity in the scope of coverage of that statute. The court, however, concludes that in light of the text of the Act as a whole, and heeding the Supreme Court's proviso that the Act be read so as to afford "the broadest possible" protection, issue elections do fall within the scope of the Act.
Certainly, defendants' contention that § 2 applies only to elections of representatives is reasonable, given the language added by Congress to the statute in 1982 specifically addressed to proof of a protected minority's lesser opportunity to elect representatives. But considering that language in the context of the Act as a whole, and further considering the intent of Congress both in originally enacting and thereafter amending § 2, and finally, in heeding the Supreme Court's insistence that the Act be broadly interpreted to afford coverage, the court concludes that it must reject defendants' position.[7]

Section 2 Analysis
Having concluded that § 2 applies to bond referenda elections, the court is next confronted with the question of the proper analysis to be applied to plaintiffs' vote dilution claims under § 2. As indicated by the foregoing discussion, whereas the Supreme Court held in Mobile v. Bolden that a § 2 violation could only be established by proof that the challenged voting practice, standard or procedure was the product of intentional discrimination, under the current version of the statute, it is clear that the voting practice *1327 under scrutiny need not be born of racial animus but rather will be considered violative of the Act if it is discriminatory in terms of results. In Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Court described the proper analytical framework for evaluating § 2 claims brought against multimember electoral schemes in light of this "results" test. And subsequently, the Court held that the same analysis applies in challenges to single-member districts as well. See Growe v. Emison, 504 U.S. ___, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). The Fifth Circuit, drawing from Thornburg, has recently clarified this analysis. See League of United Latin American Citizens v. Clements, 999 F.2d 831 (5th Cir. 1993) (LULAC IV). In LULAC IV, the court explained:
Under Gingles, plaintiffs challenging an at-large system on behalf of a protected class of citizens must demonstrate that (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. Growe v. Emison, [___ U.S. ___, ___], 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993); Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766. Satisfaction of these three "preconditions," Vionovich [Voinovich] v. Quilter, [___ U.S. ___, ___], 113 S.Ct. 1149, 1157, 2365, 122 L.Ed.2d 500 (1993), is necessary, Gingles, 478 U.S. at 50, 106 S.Ct. at 2766 but not sufficient to establish liability under § 2. Chisom v. Roemer, [501 U.S. 380, 396], 111 S.Ct. 2354, 2365, 115 L.Ed.2d 348 (1991); Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1116 (5th Cir.1991) (Westwego III). Plaintiffs must also show that, under the "totality of circumstances," they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters. Courts are guided in this second inquiry by the so-called Zimmer factors listed in the Senate Report.
LULAC IV, 999 F.2d at 849. The Zimmer factors, to which the court alluded in LULAC IV, are a number of "typical factors" identified in the Senate Report attending the 1982 amendment to § 2 which may tend to demonstrate a violation of the Act. Those factors are:
1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
LULAC IV, 999 F.2d at 849-50 n. 22 (quoting Senate Report at 28-29, reprinted in *1328 1982 U.S.Code Cong. & Admin.News at 206-07).
Here, the parties agree that Gingles and its progeny, including LULAC IV, establish the correct considerations in analyzing a § 2 challenge to a voting qualification, standard, practice or procedure in most "district line" cases, which involve the election of political candidates for office. But they also agree that the first of the three Gingles preconditions to proving vote dilution does not apply here. Since Gingles, the Supreme Court has explained that "the Gingles factors cannot be applied mechanically and without regard to the nature of the claim." Voinovich v. Quilter, ___ U.S. ___, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993). Thus, whereas under Gingles, plaintiffs mounting a § 2 attack on district configurations in the context of multimember and single member districts, must prove, in order to sustain their claim, that "the group is sufficiently large and geographically compact to constitute a majority in a single-member district," such proof is not essential in all § 2 cases. Indeed, in Voinovich, the Court recognized that the nature of some claims may require that the first Gingles precondition be modified or altogether eliminated. Id.[8] And that is so in this case. The first Gingles factor is simply of no relevance and the case turns on whether plaintiffs' proof is sufficient on the other two Gingles preconditions.
The second Gingles factor requires proof that the minority group claiming to have suffered an abridgement of its right to cast effective votes is "politically cohesive." And to satisfy the third factor, plaintiffs must demonstrate the existence of "legally significant" white block voting. In this case, plaintiffs have attempted to prove both of these elements through the testimony of their expert, Gordon Henderson. Dr. Henderson opined that since 1970, when desegregation of the public schools in Mississippi was mandated, voting on school bond issues in this state has been racially polarized, with blacks voting cohesively in favor of bond issues and whites voting as a bloc against them. His conclusions in this regard were drawn from his analysis of 93 school bond referenda elections conducted in various districts throughout the state from 1980 through 1992. Aggregating the results of these elections, Dr. Henderson made the following findings:
(1) On all issues, 73.45% of black voters voted "yes" and 52.75% of white voters voted "yes." (See Ex. PR-11);
(2) On issues that failed, 73.59% of black voters voted "yes" and 57.81% of white voters voted "no." (Ex. PR-12).
(3) On issues that failed even though they received 50 + % of the vote, 75.20% of black voters voted "yes" and 55.42% of white voters voted "no." (Ex. PR-13).
(4) On issues in districts where blacks comprised over 50% of the voting age population, 86.02% of black voters voted "yes" and 65.92% of white voters voted "no." (Ex. PR-14).
(5) On issues in districts where blacks comprised less than 50% of the voting age population, 67.91% of black voters voted "yes" and 54.95% of white voters voted "yes." (Ex. PR-15).
(6) On issues that failed in districts where blacks comprised 50 + % of the voting age population, 84.25% of black voters voted "yes" and 67.66% of white voters voted "no." (Ex. PR-16).
(7) On issues that failed in districts where blacks comprised less than 50% of the voting age population, 67.87% of black *1329 voters voted "yes" and 55.91% of white voters voted "no." (Ex. PR-17).
(8) On issues in districts where blacks comprised 50 + % of the student population, 76.83% of black voters voted "yes" and 56.26% of white voters voted "no." (Ex. PR-18).
(9) On issues that failed in districts where blacks comprised 50 + % of the student population, 74.99% of black voters voted "yes" and 61.01% of white voters voted "no." (Ex. PR-19).
(10) On issues in the February 1983 school bond election in the Jackson Municipal Separate School District, 70.89% of black voters voted "yes" and 56.64% of white voters voted "no." (Ex. PR-20).
In the court's opinion, Dr. Henderson's testimony concerning the existence of racially polarized voting in school bond elections in Mississippi is not sufficient to sustain plaintiffs' burden on this issue for a number of reasons. Rather than separately analyzing the voting in each district, Dr. Henderson approached the issues of racially polarized and bloc voting from a "macro" standpoint, grouping the results of all of the 93 elections in his data set for purposes of analysis and thereby creating what defendants have appropriately termed a "hypothetical super school district." He then subdivided the set of all elections into the different categories described in items (1) through (9), and based his opinions on these aggregated figures. An issue was raised at trial as to the propriety of this methodology and the court, over defendants' objection, admitted in evidence Exhibits PR-11 through PR-19.[9] Having now again considered this issue, the court concludes that an analysis based on such a hypothetical district as that utilized by Dr. Henderson is not proper in this case.
Plaintiffs insist that this "macro" analysis is proper, since this is not a district line case in which "geographies" are relevant. They point out that the 60% standard applies statewide and insist that therefore, the only way to evaluate the effect on the 60% requirement over the state as a whole is to employ an analytical model which aggregates all school bond election return data from the state as a whole. They contend that to find what the statewide pattern is and to assess the statewide operation of this statute, they must use this aggregated data. In support of their position, plaintiffs rely on Mississippi State Chapter, Operation Push v. Mabus, 932 F.2d 400 (5th Cir.1991), in which the court found that the geographic-specific requirements designed for analyzing § 2 dilution claims in the district line context were not logically applicable to the analysis of a challenge to a state voter registration statute which applied statewide. See PUSH, 932 F.2d at 409-410. Plaintiffs claim that the Fifth Circuit's subsequent refusal in Magnolia Bar Association v. Lee, 994 F.2d 1143, 1151 (5th Cir.1993), to accept an analysis based on aggregated data is explainable on the basis that Magnolia Bar did not involve a challenge to a statute of statewide applicability, as in PUSH and as here, but instead was a district line case governed by the district specific analysis established by Gingles.
While there is obviously a difference in the nature of the challenges in PUSH and Magnolia Bar, the court cannot agree that plaintiffs have accurately pinpointed the reason for the court's acceptance of aggregated data in one case but not the other. PUSH involved a challenge to a voter registration law which plaintiffs claimed had the effect of limiting black voter access to the polls. The court permitted aggregated data to show what the average registration rate was in the state as a whole. Nothing in that case suggests that such aggregated data may properly be used to analyze election results for cohesion or polarization. In the court's opinion, particularly in light of the Fifth Circuit's recent admonition in LULAC IV that the court look not only at the results but also at probable explanations for election results, e.g., race, interest-group politics, etc., approaching the issues of cohesion and polarization from a "macro" standpoint cannot be justified. Consequently, the court cannot view the figures reflected in Exhibits PR-11 *1330 through PR-19 as particularly probative of the issues in this case.
Even if aggregation were proper, though, Dr. Henderson's conclusions are entitled to little weight, for in the court's opinion, those conclusions are derived from a flawed data base. That is, his data set does not appear to be necessarily representative of school bond issue elections in the state during the applicable time frame. Dr. Henderson expressed his view that his data set, consisting of 93 elections from 1980 through the end of 1992, was an "adequate representation" of all school bond referenda conducted in Mississippi during this same time frame. Of those 93 issues, 58, or 62.4%, failed. The notion that his data set is "representative" of the universe of school bond elections would suggest that the elections not included in the data set would follow the same general pattern. But they do not. Dr. Henderson agreed on cross-examination that of the 43 school bond referenda he excluded from his data set because he could not obtain a reliable "match" of census and precinct data, 29 passed and only 14 failed. In view of this uncontroverted fact, it is hardly accurate to characterize Dr. Henderson's data set as "representative."
The importance of an unbiased and representative data set cannot be overstated, particularly where, as here, the plaintiffs have attempted to evaluate the relationship between passage of referenda and racial voting patterns statewide, rather than to analyze the results of each referenda. Conceivably the results of an analysis of additional elections would be consistent with and thus tend to confirm Dr. Henderson's conclusions. But where it cannot be said with confidence that the data sampling is representative of elections throughout the state during the given time frame, it cannot be said with confidence that the results of the analysis of the sampling are indicative of the true voting pattern.[10]
Even though the court, for the reasons stated, is reluctant to accept Dr. Henderson's conclusions in toto, the court does not doubt that blacks tend to vote cohesively in favor of school bond issues. It may be the case, as well, that white voters are more likely to vote against them. But even so, that does not entitle the plaintiffs to relief. That is, even were the court to accept for the sake of argument that plaintiffs have established racially polarized voting, they still have not established that the extent of such voting is "legally significant," or that race is the reason for this divergence.
In LULAC IV, the court was primarily concerned with the approach to be used in evaluating white bloc voting. The court observed in assessing this Gingles factor, that the issue "is not whether white residents tend to vote as a bloc, but whether such bloc voting is `legally significant.'" LULAC IV, 999 F.2d at 850. Two points were made clear by the LULAC IV majority: (1) For white bloc voting to be considered "legally significant," it must be shown that "the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate," id. at 858 n. 26, but, (2) even where this is shown, such bloc voting is still not "legally significant" unless race is shown to be the reason for that bloc voting, id. at 856-61. The proof in this case fails on both points. The parties have stipulated that since 1970, 132 of 270 bond issues in this state  nearly one-half  have been passed. This figure alone suggests that white bloc voting does not exist to such an extent that a white voting bloc is "usually" able to defeat the minority's choice on the ballot. Moreover, in his analysis of election results, Dr. Henderson merely determined passage results; he did not isolate white "no" votes but instead aggregated all "no" votes, both white and black. Thus, plaintiffs have not shown that failures on bond issues are caused by white bloc voting or the effect of white bloc voting in elections.[11]
*1331 The second point stressed in LULAC IV is that it is not enough for § 2 plaintiffs to prove that black voters and white voters make different choices at the polls. Rather, there must be some reliable indication as to the reason for the difference in choices: Is the difference attributable to race or to some other cause, such as partisan politics or interest-group politics? Only if the reason is race can relief be granted since "Section 2 is a balm for racial minorities, not political ones even though the two often coincide." Id. at 854 (quoting Baird v. Consolidated City of Indianapolis, 976 F.2d 357, 361 (7th Cir. 1992)). The court explained:
The scope of the Voting Rights Act is indeed quite broad, but, its rigorous protections, as the text of § 2 suggests, extend only to defeats experienced by voters "on account of race or color." Without an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense "discriminatory," and any distinction between deprivation and mere losses at the poll becomes untenable.
LULAC IV, 999 F.2d at 850. The mere "failure of minority-preferred [issues] to receive support from a majority of whites on a regular basis, without more," does not suffice to prove legally significant racial bloc voting. Id.
Plaintiffs imply in the case at bar that race is the predominant reason for the divergence in the position of black and white voters on school bond referenda, and theorize that whites typically oppose school bond issues because they tend to perceive public schools as black institutions which they choose not to support. This theory, however, is undermined by the facts. The parties have stipulated that black students first became a majority in the state's public schools in the 1987-88 school year and that they currently comprise only a bare majority, 50.44%, of public school students. Additionally, of the 93 elections included in Dr. Henderson's data set, 36 issues failed because of the 60% standard. But well over half  21  of those failures occurred in school districts in which the black percentage of the student population was less than 50% (and usually significantly less).[12] Thus, in only 15 of the 36 elections where the 60% standard actually impacted the outcome of the election was the black student population over 50%.[13] Given these facts, the court cannot accept plaintiffs' theory that the voting on these bond issues was race related. That is, the court can find no reasonable basis for concluding that "race is the predominant determinatant" of votes in school bond referenda. LULAC IV, 999 F.2d at 855.
That factors other than race likely account for white "no" votes (and black "no" votes, for that matter) on school bond issues is suggested by the plaintiffs' own arguments in this case. Plaintiffs point out that whites in Mississippi own a significant majority of the property that would be subject to increased taxes to finance bond issues and thus bear the greater tax burden for successful bond referenda. But rather than assuming that property owners might simply want to avoid paying additional taxes, plaintiffs hypothesize that white voters tend to vote "no" because they, as property owners, do not want to shoulder the burden of financing the "black public schools."
Plaintiffs view the issue in terms of black and white, when it is just as plausible, if not more so, to view the issue as a tax/no-tax issue. It is a fact that whites own the majority of owner-occupied property (approximately 80% of value of all such property statewide), and thus may be less inclined to vote "yes" to increase their property taxes. But that does not provide a basis for concluding that "race" is the reason for their voting behavior and suggests, instead, that self-interest *1332 may be the reason. As the Fifth Circuit recognized in LULAC IV, political preferences often coincide with race, but no violation of § 2 can be found unless it can be said that votes are cast because of race, and not because of partisan or interest-group politics. Id. at 856 ("Congress was not unaware that political preference [and group interests] often correlate[] strongly with socioeconomic status ... [but] [t]his observation did not, however, lead Congress to soften the line between partisan [or interest-group] politics and race vote dilution...."). The court here is not persuaded that race accounts for the "no" votes of white electors in school bond issue elections and, to the contrary, the court considers it likely that the defeat of such issues stems from an aversion of property owners to additional taxation.
On the basis of the court's conclusions thus far, it follows that plaintiffs cannot succeed on their § 2 claim. The court concludes further, though, that plaintiffs, even had they proved the applicable Gingles preconditions, have not shown that under the "totality of circumstances," they have less opportunity to participate in the political process than white voters and elect issues of their choice. The Zimmer factors, supra at p. 1327, which guide the court's inquiry in this regard, are not applicable across the board to issue elections such as that involved here. A review of the proof in this case under the Zimmer factors that are, or are arguably applicable, reveals the following.
There is some evidence of racially polarized voting, though its extent has not been adequately proven. Moreover, a number of court decisions have found that Mississippi has a history of official discrimination against black citizens in the State of Mississippi touching the rights of black citizens to register to vote, to elect candidates of their choice, and otherwise participate in the political process.[14] However, as Judge William H. Barbour appropriately observed in Magnolia Bar Association v. Lee, 793 F.Supp. 1386, 1408 (S.D.Miss.1992), that history is remote, and the extent to which black (and white) citizens presently fail to exercise their obligation to vote is attributable more to apathy than any history of discrimination. The next applicable Zimmer factor focuses on "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." As the LULAC IV majority recognized, "disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority participation." Id. at 866 (quoting S.Rep. 417 at 29 n. 114, reprinted in U.S.Code Cong. & Admin.News at 207 n. 114). However, such socioeconomic factors are not relevant unless they are shown to hinder the ability of black citizens to participate in the political process. Id. It is undisputed that disparities, often significant, in the levels of education, income and living conditions exist between white and black residents of this state which are, at least in part, attributable to past discrimination. And it may be that these disparities have in the past, and perhaps in more recent times as well, resulted in depressed levels of black participation in the political process, though again, the true level of participation in school bond elections is not known. The court would observe, though, as did Judge Barbour in Magnolia Bar, that in the absence of present official discrimination, "it is ... incumbent upon blacks ... to exercise [their] right [to vote]," and "the extent to which [they fail to do so] diminishes the weight to be given the history of official discrimination." Magnolia Bar, 793 F.Supp. at 1408. Even plaintiff's own expert, Dr. Henderson, identified motivation, or a lack thereof, as a factor in the level of black voters' participation in school bond elections. According to the figures from the composite of elections analyzed by Dr. Henderson, though black voters consistently turned out in lower percentages than did white voters, in situations where black voters were motivated to vote, the turnout of black voters increased dramatically.[15] *1333 Accepting the implications of Dr. Henderson's testimony on the subject of black voter turnout, then, it does not seem reasonable to conclude that depressed levels of participation in these elections are necessarily or solely attributable to the socioeconomic effects of past discrimination.
As to the sixth Zimmer factor, there is no proof in the record of any school bond elections that have been marked by racial appeals, subtle or overt. And as to the next factor, it is stipulated by the parties that of approximately 5109 elected officials in Mississippi, approximately 839 are black. The final factor of relevance in evaluating the totality of the circumstances is whether the policy underlying the challenged voting standard or practice is "tenuous." The court finds, in accordance with the State's position in this case, that the 60% standard, while certainly a voting standard, is more appropriately viewed, from the state's perspective, as reflecting a fiscal policy of the state, the purpose of which is to encourage financial responsibility on the part of local governmental units. So viewed, the state's interest cannot be said to be tenuous.[16] Having considered the "totality of the circumstances," the court concludes that plaintiffs have not established that "they do not possess the same opportunities to participate in the political process and elect [issues] of their choice enjoyed by other voters." LULAC IV, 999 F.2d at 849. Clearly, a significant number of school bond issues fail because of the 60% requirement. This requirement has resulted in a number of losses for school bond proponents that would have been wins were a simple majority required for passage. Of the 93 bond issues included in Dr. Henderson's data set, 36 of the 58 that failed would have passed by a simple majority.[17] But this is significant for the court's inquiry only if these failures significantly impacted the effectiveness of the votes of black electors because of their race. And considering the evidence as a whole, the court simply is not persuaded that the defeat of school bond issues resulting from the 60% requirement is race related,[18] or that black voters lack access to the political process. Plaintiffs' § 2 claim, therefore, fails.

THE CONSTITUTIONAL CLAIM
The Supreme Court, in Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), explicitly rejected the view that supermajority requirements are unconstitutional simply because the votes of some electors (e.g., "yes" electors) are accorded less weight than the votes of other electors (e.g., "no" electors). Such provisions, the Court observed, "[do] not violate the equal protection clause or any other provision of the Constitution." Id. at 8, 91 S.Ct. at 1893. The Court observed:
Certainly any departure from strict majority rule gives disproportionate power to the minority. But there is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue. *1334 Id. at 6, 91 S.Ct. at 1892. This proposition, though, was subject to one qualification: supermajority requirements may be constitutionally infirm if they result "in the denial or dilution of voting power because of group characteristics ... that [bear] no relation to the interest of those groups in the subject matter of the election...." Id. at 5, 91 S.Ct. at 1891-92. Where there is "no independently identifiable group or category that favors" school bond referenda such that there is "no sector of the population [that] may be said to be `fenced out' from the franchise because of the way they will vote," id. at 5, 91 S.Ct. at 1892, there can be no equal protection violation. As contrasted with the proof required under § 2, to prove a constitutional violation, it is not enough that the 60% requirement has the effect of "fencing out" a sector of the population from the franchise; rather, to establish a constitutional violation, plaintiffs must show that a discriminatory purpose was a motivating factor in the enactment and maintenance of the requirement. See Arlington Heights v. Metro. Housing Corp., 429 U.S. 252, 264, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) ("official action will not be held unconstitutional solely because it results in a racially disproportionate impact"). Though plaintiffs here insinuate that the original enactment of the 60% statute may have been racially motivated, they have not undertaken to prove that point. Defendants, on the other hand, offered proof via the testimony of Dr. Wesley Busbee that the 60% standard was adopted for the racially neutral reason of imposing fiscal responsibility on local governmental units. However, plaintiffs do contend that Mississippi's maintenance of the statute has been motivated, at least in part, by racial considerations.
The argument most forcefully made by plaintiffs to substantiate their position that the 60% standard has been maintained for racial reasons centers on events which transpired in the Mississippi House of Representatives in 1986, when an amendment was proposed which would have eliminated that requirement. Specifically, plaintiffs argue that white legislators perceived the amendment as favorable to blacks and therefore voted against the amendment in retaliation for conduct by black legislators which they had found offensive. Earlier in the week that the bill was considered by the House, the seventeen black members of the House had staged a filibuster of sorts as an expression of their "frustration" over the House's refusal to consider a proposal for a state holiday honoring the late Dr. Martin Luther King, Jr. As a result of this action by the black legislators, and because this occurred near the end of the legislative session, none of the 117 bills that remained pending on the calendar reached the House for a vote and consequently, all of those bills died. Revenue bills, however, remained for consideration, and during the House debate over the proposed amendment to § 37-59-17 (which was considered a revenue bill), remarks were made by both white and black representatives concerning that earlier conduct of the black legislators. One or two white legislators spoke out criticizing what they termed the "irresponsible" conduct of the black legislators, and many black representatives defended their conduct. In the course of these proceedings, comments were made by legislators, black and white, which suggested that those legislators viewed the maintenance of the 60% standard as race related.
One white legislator remarked that there existed the prospect that the 60% standard would be maintained in "retaliation to some of the actions that have been taken here this week by some of our black colleagues." Another implored his fellow representatives to lay aside "any spirit of vindictiveness residing in [their] hearts" and vote for the bill on its merits. Many of the black legislators, speaking on points of personal privilege in response to the charge that they had acted irresponsibly, referred to matters of race. One equated educational issues with racial issues, and accused House members of racism, referring to what he perceived as "the lack of educational support and the racism that permeates this body from time to time." Others alluded to the difficulties that they, as black representatives, had experienced in getting legislation passed because of their race, or so they assumed. One stated: "If you want to kill this bill because of the little hassle we've had this week, that's your privilege. *1335 But I've sat back for seven long years, wouldn't come to the podium because if one of us comes to this podium you're going to kill some legislation. I'm not going to sit back anymore. If you want to kill it, you kill it. That's your privilege. But I can't sit back in my seat any longer, afraid to come to the podium because I'm working with a group of colleagues who would kill it just because I appear here."
Plaintiffs argue that these various statements by legislators prove that the failure of the amendment, ultimately, was racially motivated, characterizing the statements as "unusually direct evidence by legislators themselves of racial distinctions as a factor in the issue involved here." Perhaps the manner in which one views the remarks of these legislators in the context of the issue involved here is as much a matter of perspective as anything else. But the court has carefully reviewed the transcript of the legislative debate over the amendment to § 37-59-17 and cannot conclude that the debate and remarks reveal a racial animus or motivation by white legislators. It does appear from the transcript that black legislators, each of whom supported the amendment, perceived the issue as a racial one. And it seems, as well, that some white representatives, at least in some sense, related the amendment to race, as two legislators who supported the repeal of the 60% standard expressed concern that some of their white colleagues might vote against the amendment in retaliation against black members for what some perceived as their "irresponsible" conduct relating to the Martin Luther King, Jr. holiday proposal. But in the end, the fact that some House members perceived that the amendment involved racial considerations does not make it so, and the court is not willing to conclude, based on nothing more than the personal perceptions of a few individuals, that the Mississippi House of Representatives failed to amend the statute on the basis of race.[19]Cf. PUSH, 932 F.2d at 408 (refusing to infer discriminatory motivation from isolated and ambiguous statements made by legislators during debate over bill).
Of course, all of those who mentioned the issue of race, directly or otherwise, were proponents of the amendment. The court recognizes that no legislator would likely admit that he or she would or had voted on the basis of race or a racial motivation. But the theme that predominated the debate by those against the amendment was the opposition to raising property taxes. Plaintiffs insist that the role of race in the debate and ultimately, the vote, is seen when one "reads between the lines." The court, though, has reviewed the transcript and discerns no covert or subtle racial innuendo in the remarks by opponents of the amendment and is persuaded that the opposition to the measure was not anti-black but anti-tax.[20]
*1336 Plaintiffs next claim that even if opponents were motivated in substantial part by a desire to avoid increasing the potential tax burden on property owners, there is still an element of race distinction in the vote to retain the 60% standard which requires a finding that the standard is unconstitutional. They argue that objective sociological factors highlight the "substantially different objective stakes which black and white voters have in [this] policy issue which puts the beneficiaries of the state's public schools in competition with the interests of property owners with the greatest economic stakes in avoiding increases of taxes on the values of such properties." In other words, they contend that blacks make up the majority in this state's public schools and whites own the majority of owner-occupied housing, and that consequently, whereas blacks have a higher stake than whites in the public schools, whites have a disproportionately higher stake in property tax avoidance. Thus, while they acknowledge that it might be logical from an economic standpoint to argue that it is "unfair" for blacks, who are characterized as the "beneficiaries of public school improvements," to have the same per-voter weight at the polls as do white property owners who would bear the greater financial burden, nevertheless, if such considerations have even partially motivated the maintenance of the 60% standard, then the standard must be ruled unconstitutional. The court rejects plaintiff's argument, as it is premised on the notion that blacks are the beneficiaries, or the principal beneficiaries of school improvements in Mississippi. As the court observed with respect to plaintiffs' § 2 claim, that is not the case. There is no rational basis for viewing the public schools of this state as "black" institutions, and the simple fact that white property owners may choose to oppose additional property taxes cannot and should not be interpreted as opposition to a distinctly black issue.
Plaintiffs allege, finally, that with one insignificant exception, school bond issues are the only local bond issues that are subject to mandatory elections which require a 60% super-majority vote for passage. They argue that there are no reasons for these especially high election hurdles "apart from a legislative purpose of deterring property tax increases due to the particular `factions' who would be especially interested in bond financing for public school improvements as such." However, a credible explanation of this distinction was provided by defense witness James Reeves, who testified that, whereas cities and counties rely exclusively on funds from bond issues for their capital needs, school districts have a number of alternative sources of revenue for capital expenditures, including the three mill-ten year levy, the sixteenth section principal fund, the public school building fund and other revenue sources. The court, therefore, rejects plaintiff's argument.
In summary, the court, having considered all of the evidence presented by the parties, is not persuaded that the original enactment or maintenance of the 60% standard for elections on school bond referenda has been racially motivated and the court thus concludes that plaintiffs have not proven a constitutional violation.

CONCLUSION
Because the court has concluded that plaintiffs have failed to sustain their burden to prove their statutory and constitutional claims, their complaint must be dismissed. Accordingly, it is ordered that plaintiffs' complaint is dismissed.
A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.
ORDERED.
NOTES
[1] Cause Number J86-0817(L) was originally filed in 1986 challenging the operation of Miss.Code Ann. § 37-59-17 as applied to the Jackson Municipal Separate School District. Thereafter, in 1991, the Robinson plaintiffs filed a separate action, Cause Number J91-0687(L), attacking the statute as it applies statewide. The actions were consolidated by order of the court. Named as defendants in these consolidated actions are John Johnson, President of the Board of Directors of the Mississippi School Boards Association; Claude Hartley, Vice-President of the Board of Directors of the Mississippi School Boards Association; Mark G. Bailey, Louis W. Wright, Mona K. Weber, Tim M. Medley and Doris G. Bridgeman, members of the governing school board of the Jackson Municipal Separate School District; Mike Moore, Attorney General of the State of Mississippi; and Kirk Fordice, Governor of the State of Mississippi.
[2] See Chisom, 501 U.S. at 387, 111 S.Ct. at 2359 ("section 5 and section 2, virtually companion sections, operate in tandem to prohibit discriminatory practices in voting, whether those practices originate in the past, present, or future") (quoting Chisom v. Edwards, 839 F.2d 1056, 1064 (1988)). In Chisom, the Court, further noting that "Section 5 uses language similar to that of § 2 in defining prohibited practices," id., 501 U.S. at 401-02, 111 S.Ct. at 2367, implied that the coverage of the two sections is coextensive since there could otherwise be the "anomalous result" of coverage of a voting practice under § 5 without coverage of that same practice under § 2, id.
[3] The Act originally provided:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.
[4] Chisom, 501 U.S. at 393 n. 20, 111 S.Ct. at 2363 n. 20 (quoting S.Rep. No. 97-417, p. 2 (1982), U.S.Code Cong. & Admin. News 1982, pp. 177-179).
[5] The Court in Chisom ultimately concluded that judges are aptly characterized as "representatives" of their districts, at least where each of several members of a court is required to be a resident of his or her district and to be elected by the voters of that district and consequently, dilution claims respecting judicial elections were held cognizable under Section 2.
[6] The Court rejected a construction of the statute that would have excluded vote dilution claims from the coverage of § 2, because it was "convinced that if Congress had such an intent [in amending the statute], Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendment." Id., 501 U.S. at 395-96, 111 S.Ct. at 2364.
[7] This court's opinion in this regard is supported by the Eleventh Circuit's decision in Lucas v. Townsend, 908 F.2d 851, 856 (11th Cir.1990), wherein the court held that "bond referendums, which are a form of proposition, fall within the express language of the Act." The court observed that "[t]he Voting Rights Act is designed to assure equal opportunity for the minority to express its political will whether in the election of the candidate of their choice or in voting for the proposition of their choice," id. at 857, and that "[m]inority communities have the right to vote for or against the propositions of their choice just as they have a right to a fully effective vote to elect candidates of their choice," id. at 858.
[8] The plaintiffs in Voinovich were challenging Ohio's redistricting scheme, contending that Ohio's plan, by creating majority-minority districts, "deprived them of `influence districts' in which they would have constituted an influential minority." Voinovich, ___ U.S. at ___, 113 S.Ct. at 1155. The Court declined to decide whether such an "influence dilution" claim is viable under Section 2, and instead assumed for purposes of resolving the case that it would be. Nor did the Court decide how Gingles' first factor might be applied to such cases, since the plaintiffs' proof failed on the third Gingles precondition. The Court did, though, recognize that the first precondition could not be strictly applied since "[t]he complaint in [influence-dilution] cases is not that black voters have been deprived of the ability to constitute a majority, but of the possibility of being a sufficiently large minority to elect their candidate of choice without the assistance of cross-over votes from the white majority." Id., ___ U.S. at ___, 113 S.Ct. at 1157.
[9] Defendants did not object to the admission of PR-20 since it dealt with a single school district.
[10] As defendants point out, "the Mississippi that Dr. Henderson analyze[d] and present[ed] is one in which school bond referenda were far more likely to fail than in fact was the case, and, therefore, Dr. Henderson's Mississippi undoubtedly had lower levels of white voter support for school bond referenda than actually existed."
[11] In this regard, upon questioning by defendants on cross-examination, Dr. Henderson admitted that in four of seven bond issues defeated in the Jackson Municipal Separate School District in 1991, the white "no" vote did not reach 40% and consequently, those issues were defeated not by white votes but by the confluence of black and white "no" votes.
[12] These elections were held in 17 districts; 10 of those districts had majority white populations.
[13] The court would note, too, that in 22 of the 58 that failed, the "yes" vote was less than 50%, which means that the failure of those issues was not impacted by the 60% standard.
[14] It is stipulated that prior to the passage of the Voting Rights Act in 1965, Mississippi had in place such provisions as literacy tests and the poll tax, which excluded black citizens from participation in the electoral process.
[15] For example, the highest level of white voter participation in any category analyzed by Dr. Henderson, according to his computation, was 32.53%. Black turnout approached that mark, reaching 27.45%, in elections where blacks comprised 50+% of the district voting age population.

In this vein, the court would observe that Dr. Henderson testified that black voter turnout declined from 19.07% in those bond issue elections that failed, to 18.92% in those that failed even though receiving more than 50% of the votes. From that, he inferred that "blacks really believed that if they were unlikely to be able to affect the outcome of the election ... they just did not see a likelihood that they were going to be able to materially affect the outcome of the election," and so they did not go to the polls. However, this theory does not account for the fact that white voter turnout also declined from 32.07% in those issues that failed, to 29.69% in the issues that failed though receiving more than 50% of the votes for passage.
[16] Whether the standard is necessary or desirable to achieve this goal is certainly debatable, but it is not the function of this court, but rather that of the state legislature, to assess the wisdom of the statute.
[17] There have been 64 instances since 1974 in which the vote for passage exceeded 50% yet fell short of the 60% requirement for passage.
[18] To the contrary, in the court's opinion, it is likely that the defeat of school bond issues stems from an aversion of property owners to additional taxation.
[19] As further evidence to support their claim that the 60% standard was maintained for racial reasons, plaintiffs point to an editorial which appeared in The Clarion Ledger newspaper following the February 1986 debate. That editorial reported that "some of the vote was perceived as a retribution against black House members who, using a House rule, have delayed proceedings this week seeking to force a vote on a bill to designate the birthday of Dr. Martin Luther King, Jr., as a state holiday." The article cited Representative Ed Perry of Oxford as saying that this delay by blacks "`definitely' had an impact," and concluded with the statement, "Voting against the schools as retaliation against black House members not only smacks of racism but sends out a message that some House members consider the public schools as facilities for blacks." Again, while the court does not minimize the significance of such "subtle matters" as perceptions, the court is convinced that the opinion of a newspaper editor, which is in turn based on the perceptions of a select few House members, cannot justify the conclusion that the vote was race based.
[20] As additional evidence in support of their position that the vote on the amendment was racially motivated, plaintiffs have offered the "expert" testimony of Dr. David Sansing, Bill Minor and Representative Hillman Frazier. Dr. Sansing, a historian of Mississippi history, is offered for his expertise on Mississippi educational history; Bill Minor, a professional political analyst, is offered for his expertise in legislative behavior and motivation; and Representative Hillman Frazier is offered for his expertise, based on his many years experience as a House member which has given him an "informed intuition," in judging political motivation. While the court has no doubt that each of these individuals possesses a wealth of knowledge in his respective field, and the court finds their views and opinions interesting, the court does not consider that any is an "expert" on political motivation.