## GORDON et al. *v.* LANCE et al.

No. 96.   Argued January 18, 1971—Decided June 7, 1971

BURGER, C. J., delivered the opinion of the Court, in which BLACK, DOUGLAS, STEWART, WHITE, and BLACKMUN, JJ., joined. HARLAN, J., filed a statement concurring in the result, *post,* p. 8. BRENNAN and MARSHALL, JJ., filed a dissenting statement, *post,* p. 8.

*George M. Scott* argued the cause and filed briefs for petitioners.

*Charles C. Wise, Jr.,* argued the cause for respondents. With him on the brief was *J. Henry Francis, Jr.*

1

Briefs of *amici curiae* urging reversal were filed by *Slade Gorton,* Attorney General of Washington, and *Philip H. Austin,* Assistant Attorney General, for the State of Washington et al.; by *Thomas M. O'Connor* for the City and County of San Francisco; by *Francis R. Kirkham* and *Francis N. Marshall* for the California Taxpayers' Association; and by *George E. Svoboda* for Hayes Smith.

Briefs of *amici curiae* urging affirmance were filed by *James R. Ellis* for Seattle School District No. 1; by *Stephen J. Pollak, William H. Dempsey, Jr., Ralph J. Moore, Jr.,* and *Robert H. Chanin* for the National Education Association et al.; by *August W. Steinhilber* and *Robert G. Dixon, Jr.,* for the National School Boards Association; by *David R. Hardy* and *Robert E. Northrup* for the Missouri State Teachers Association; by *William B. Beebe, Hershel Shanks,* and *Allan I. Mendelsohn* for the American Association of School Administrators et al.; by *Melvin L. Wulf* for the American Civil Liberties Union et al.; and by *Paul W. Preisler* for the Committee for the Equal Weighting of Votes.

Briefs of *amici curiae* were filed by *John W. Witt* and *Joseph Kase, Jr.,* for the City of San Diego et al., and by *Chas. Claflin Allen, pro se.*

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to review a challenge to a 60% vote requirement to incur public debt as violative of the Fourteenth Amendment.

The Constitution of West Virginia and certain West Virginia statutes provide that political subdivisions of the State may not incur bonded indebtedness or increase tax rates beyond those established by the Constitution without the approval of 60% of the voters in a referendum election.

On April 29, 1968, the Board of Education of Roane County, West Virginia, submitted to the voters of Roane County a proposal calling for the issuance of general obligation bonds in the amount of $1,830,000 for the purpose of constructing new school buildings and improving existing educational facilities. At the same election, by separate ballot, the voters were asked to authorize the Board of Education to levy additional taxes to support current expenditures and capital improvements. Of the total votes cast, 51.55% favored the bond issues and 51.51% favored the tax levy. Having failed to obtain the requisite 60% affirmative vote, the proposals were declared defeated.

Following the election, respondents appeared before the Board of Education on behalf of themselves and other persons who had voted in favor of the proposals and demanded that the Board authorize the bonds and the additional taxes. The Board refused.

Respondents then brought this action, seeking a declaratory judgment that the 60% requirements were unconstitutional as violative of the Fourteenth Amendment. In their complaint they alleged that the Roane County schools had been basically unimproved since 1946 and fell far below the state average, both in classroom size and facilities. They further alleged that four similar proposals had been previously defeated, although each had received majorities of affirmative votes ranging from 52.51% to 55.84%. The West Virginia trial court dismissed the complaint. On appeal, the West Virginia Supreme Court of Appeals reversed, holding that the state constitutional and statutory 60% requirements violated the Equal Protection Clause of the Fourteenth Amendment. 153 W. Va. 559, 170 S. E. 2d 783 (1969). We granted certiorari, 397 U. S. 1020 (1970), and for the reasons set forth below, we reverse.

The court below relied heavily on two of our holdings dealing with limitations on the right to vote and dilution of voting power. The first was *Gray* v. *Sanders,* 372 U. S. 368 (1963), which held that Georgia's county-unit system violated the Equal Protection Clause, because the votes of primary electors in one county were accorded less weight than the votes of electors in other counties. The second was *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), in which we held impermissible the limitation to "property taxpayers" of the right to vote in a revenue bond referendum. From these cases the state court concluded that West Virginia's requirement was constitutionally defective, because the votes of those who favored the issuance of the bonds had a proportionately smaller impact on the outcome of the election than the votes of those who opposed issuance of the bonds.

We conclude that the West Virginia court's reliance on the *Gray* and *Cipriano* cases was misplaced. The defect this Court found in those cases lay in the denial or dilution of voting power because of group characteristics—geographic location and property ownership—that bore no valid relation to the interest of those groups in the subject matter of the election; moreover, the dilution or denial was imposed irrespective of how members of those groups actually voted.[1]

Thus in *Gray, supra,* at 381 n. 12, we held that the county-unit system would have been defective even if unit votes were allocated strictly in proportion to population. We noted that if a candidate received 60% of the votes cast in a particular county he would receive that county's entire unit vote, the 40% cast for the other

---

[1] While *Cipriano* involved a denial of the vote, a percentage reduction of an individual's voting power in proportion to the amount of property he owned would be similarly defective. See *Stewart* v. *Parish School Board,* 310 F. Supp. 1172 (ED La.), aff'd, 400 U. S. 884 (1970).

candidates being discarded. The defect, however, continued to be geographic discrimination. Votes for the losing candidates were discarded solely because of the county where the votes were cast. Indeed, votes for the winning candidate in a county were likewise devalued, because all marginal votes for him would be discarded and would have no impact on the statewide total.

Cipriano was no more than a reassertion of the principle, consistently recognized, that an individual may not be denied access to the ballot because of some extraneous condition, such as race, e. g., Gomillion v. Lightfoot, 364 U. S. 339 (1960); wealth, e. g., Harper v. Virginia Board of Elections, 383 U. S. 663 (1966); tax status, e. g., Kramer v. Union Free School Dist., 395 U. S. 621 (1969); or military status, e. g., Carrington v. Rash, 380 U. S. 89 (1965).

Unlike the restrictions in our previous cases, the West Virginia Constitution singles out no "discrete and insular minority" for special treatment. The three-fifths requirement applies equally to all bond issues for any purpose, whether for schools, sewers, or highways. We are not, therefore, presented with a case like Hunter v. Erickson, 393 U. S. 385 (1969), in which fair housing legislation alone was subject to an automatic referendum requirement.

The class singled out in Hunter was clear—"those who would benefit from laws barring racial, religious, or ancestral discriminations," supra, at 391. In contrast we can discern no independently identifiable group or category that favors bonded indebtedness over other forms of financing. Consequently no sector of the population may be said to be "fenced out" from the franchise because of the way they will vote. Cf. Carrington v. Rash, supra, at 94.

Although West Virginia has not denied any group access to the ballot, it has indeed made it more difficult

for some kinds of governmental actions to be taken. Certainly any departure from strict majority rule gives disproportionate power to the minority. But there is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue. On the contrary, while we have recognized that state officials are normally chosen by a vote of the majority of the electorate, we have found no constitutional barrier to the selection of a Governor by a state legislature, after no candidate received a majority of the popular vote. *Fortson* v. *Morris,* 385 U. S. 231 (1966).

The Federal Constitution itself provides that a simple majority vote is insufficient on some issues; the provisions on impeachment and ratification of treaties are but two examples. Moreover, the Bill of Rights removes entire areas of legislation from the concept of majoritarian supremacy. The constitutions of many States prohibit or severely limit the power of the legislature to levy new taxes or to create or increase bonded indebtedness,[2] thereby insulating entire areas from majority control. Whether these matters of finance and taxation are to be considered as less "important" than matters of treaties, foreign policy, or impeachment of public officers is more properly left to the determination by the States and the people than to the courts operating under the broad mandate of the Fourteenth Amendment. It must be remembered that in voting to issue bonds voters are committing, in part, the credit of infants and of generations yet unborn; and some restriction on such commitment is not an unreasonable demand. That the bond issue may have the desirable objective of providing better education for future generations goes to the wisdom of

---

[2] *E. g.,* Indiana Constitution, Art. 10, § 5; Ohio Constitution, Art. 8, § 3; Texas Constitution, Art. 3, § 49; Wisconsin Constitution, Art. 8, § 4.

an indebtedness limitation: it does not alter the basic fact that the balancing of interests is one for the State to resolve.

Wisely or not, the people of the State of West Virginia have long since resolved to remove from a simple majority vote the choice on certain decisions as to what indebtedness may be incurred and what taxes their children will bear.

We conclude that so long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause.[3] We see no meaningful distinction between such absolute provisions on debt, changeable only by constitutional amendment, and provisions that legislative decisions on the same issues require more than a majority vote in the legislature. On the contrary, these latter provisions may, in practice, be less burdensome than the amendment process.[4] Moreover, the same considerations apply when the ultimate power, rather than being delegated to the legislature, remains with the people, by way of a referendum. Indeed, we see no constitutional distinction between the 60% requirement in the present case and a state requirement that a given issue be approved by a majority of all registered voters.[5] Cf. *Clay* v. *Thornton*, 253 S. C. 209, 169 S. E.

---

[3] Compare *Reitman* v. *Mulkey*, 387 U. S. 369 (1967).

[4] Some 14 States require an amendment to be approved by two sessions of the legislature, before submission to the people. West Virginia's Constitution, Art. 14, § 2, provides for approval by two-thirds of a single legislature and a majority of the voters.

[5] In practice, the latter requirement would be far more burdensome than a 60% requirement. There were 8,913 registered voters in Roane County in 1968, of whom 5,600 voted in the referendum at issue. If a majority of all eligible voters had been required, approval would have required the affirmative votes of over 79% of those voting. See State of West Virginia, Official Returns of 1970 Primary Election (including the 1968 registration figures).

2d 617 (1969), appeal dismissed *sub nom. Turner* v. *Clay,* 397 U. S. 39 (1970).

That West Virginia has adopted a rule of decision, applicable to all bond referenda, by which the strong consensus of three-fifths is required before indebtedness is authorized, does not violate the Equal Protection Clause or any other provision of the Constitution.[6]

*Reversed.*

MR. JUSTICE HARLAN concurs in the result for the reasons stated in his separate opinion in *Whitcomb* v. *Chavis, post,* p. 165.

MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL would affirm for the reasons expressed in the opinion of the West Virginia Supreme Court of Appeals, 153 W. Va. 559, 170 S. E. 2d 783 (1969).

---

[6] We intimate no view on the constitutionality of a provision requiring unanimity or giving a veto power to a very small group. Nor do we decide whether a State may, consistently with the Constitution, require extraordinary majorities for the election of public officers.