No. 93-657

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

ALAN NICHOLSON; JERRY CALVERT; MONTANANS FOR
RESPONSIBLE GOVERNMENT, an unincorporated association;
MONTANA EDUCATION ASSOCIATION, a Montana corporation;
MONTANA FEDERATION OF TEACHERS, a unincorporated
association; MONTANA FEDERATION OF STATE EMPLOYEES,
an unincorporated association; MONTANA PUBLIC
EMPLOYEES ASSOCIATION/EMPLOYEES POLITICAL INFORMATION
COMMITTEE, a Montana corporation; AMERICAN FEDERATION
OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES/MONTANA
COUNCIL NINE, an unincorporated association affiliated
with American Federation of State, County, and
Municipal Employees; ASSOCIATED STUDENTS OF MONTANA
STATE UNIVERSITY, an unincorporated association; MONTANA
STATE UNIVERSITY FACULTY COUNCIL; ASSOCIATED STUDENTS
OF EASTERN MONTANA COLLEGE, an unincorporated association;
MONTANA LOW INCOME COALITION, a Montana corporation;
and ASSOCIATED STUDENTS OF THE UNIVERSITY OF MONTANA,

Plaintiffs, Appellants and Cross-Respondents,

v.

MIKE COONEY, Secretary of State of the State of
Montana; ROBERT G. NATELSON, individually and as
Chairman of MONTANANS FOR BETTER GOVERNMENT, P.A.C.;
MONTANANS FOR BETTER GOVERNMENT, P.A.C., a citizens
group, registered as a political committee,

Defendants, Respondents and Cross-Appellants.

APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis and Clark,
               The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        James H. Goetz (argued) and Richard J. Dolan; Goetz,
        Madden and Dunn, Bozeman, Montana
        Jim McGarvey, Attorney at Law, Helena, Montana

    For Respondents:

        Gerald J. Neely (argued), Attorney at Law, Billings, MT
        Hon. Joseph P. Mazurek, Attorney General, Beth Baker
        (argued), Assistant Attorney General, Helena, Montana

                              Submitted:  May 24, 1994
                               Decided:  June 30, 1994

Filed:

_____
                        /Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an action to declare unconstitutional Referendum 112 and the suspension of 1993 Mont. Laws 634 prior to a referendum vote. The District Court for the First Judicial District, Lewis and Clark County, granted summary judgment in favor of defendants. Plaintiffs appeal, and defendant Secretary of State Mike Cooney cross-appeals. We affirm.

The issues are:

1. Did the District Court err in concluding that Counts II and V of the amended complaint were not time-barred under § 3-5-302(6)(a), MCA?

2. Does the suspension of Chapter 634 pending a referendum vote deny equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and Article II, Section 4 of the Montana Constitution?

3. Does the suspension of Chapter 634, which placed the state's budget out of balance, violate Article VIII, Section 9 of the Montana Constitution?

4. Does Chapter 634 constitute an appropriations measure on which a referendum vote is prohibited?

5. Does suspension of Chapter 634 constitute a surrender and suspension of the taxation power in violation of Article VIII, Section 2 of the Montana Constitution?

In 1993, the Montana legislature enacted a revision of state income tax and corporate tax laws. The measure, 1993 Mont. Laws

2

634 (Chapter 634), increases the income tax burden on some individual taxpayers while reducing it on others, increases minimum corporate taxes, and imposes graduated corporate tax rates. The purposes of the measure include raising revenues for the general operation of state government and balancing the state's budget.

Had Montana voters adopted a proposed four percent general sales tax at the June 1993 primary election, Chapter 634 would have been repealed beginning January 1, 1994, and the sales tax would have taken effect at that time. However, the voters rejected the sales tax. Therefore, under the scheme adopted by the legislature, Chapter 634 remained in effect.

During the summer of 1993, defendants Natelson and Montanans for Better Government circulated petitions in support of Referendum 112, in order to place Chapter 634 on the ballot in the November 1994 general election pursuant to Article III, Section 5 of the Montana Constitution. On September 3, 1993, defendant Secretary of State Mike Cooney certified to the Governor that he had received petitions containing sufficient signatures to place Chapter 634 on the ballot at that election. On September 28, 1993, defendant Cooney certified to the Governor that he had received petitions containing sufficient signatures to require suspension of Chapter 634 until the vote on Referendum 112, pursuant to subsection (2) of the Constitutional referendum power.

The Governor issued a proclamation calling the legislature into special session. Among other things, the proclamation stated that "the suspension of [Chapter 634] has made its provisions

3

inoperative, thereby making it virtually impossible to balance the state's budget without legislative action."

Plaintiffs filed this action for declaratory judgment on October 18, 1993. While it was pending before the District Court, the special session of the legislature began. By the close of the special session in December 1993, the legislature had made substantial cuts in appropriations in order to balance the budget.

Plaintiffs' amended complaint contains seven counts. Counts I through VI challenge the constitutionality of Referendum 112. Count VII alleges fraud on the part of defendants Natelson and Montanans for Better Government. At the hearing giving rise to this appeal, the District Court heard only those claims relating to the constitutionality of Referendum 112. Plaintiffs' fraud claim, Count VII of the amended complaint, was reserved for possible hearing at a later date.

The District Court thoroughly analyzed the issues in a twenty-four page memorandum and order. Before it reached the plaintiffs' constitutional arguments, it rejected the argument of defendant Cooney that portions of the amended complaint were time-barred. The court then considered and rejected all of plaintiffs' constitutional arguments, upholding the constitutionality of the referendum process in this case.

\* \* \*

This case requires reexamination of the referendum power which the people of Montana have reserved to themselves since 1906, when it was first adopted by amendment to the Montana Constitution. See

4

Art. V, Sec. 1, Mont. Const. (1889). The referendum provision of Montana's present Constitution provides:

> **Referendum.** (1) The people may approve or reject by referendum any act of the legislature except an appropriation of money. A referendum shall be held either upon order by the legislature or upon petition signed by at least five percent of the qualified electors in each of at least one-third of the legislative representative districts. The total number of signers must be at least five percent of the qualified electors of the state. A referendum petition shall be filed with the secretary of state no later than six months after adjournment of the legislature which passed the act.
>
> (2) An act referred to the people is in effect until suspended by petitions signed by at least 15 percent of the qualified electors in a majority of the legislative representative districts. If so suspended the act shall become operative only after it is approved at an election, the result of which has been determined and declared as provided by law.

Art. III, Sec. 5, Mont. Const.

In interpreting this provision, we are guided by the principle that "initiative and referendum provisions of the Constitution should be broadly construed to maintain the maximum power in the people." Chouteau County v. Grossman (1977), 172 Mont. 373, 378, 563 P.2d 1125, 1128. We are also mindful, in considering this appeal, of the first two substantive provisions of the Montana Constitution. Article II, Section 1, provides:

> **Popular sovereignty.** All political power is vested in and derived from the people. All government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole.

Article II, Section 2, provides:

> **Self-government.** The people have the exclusive right of governing themselves as a free, sovereign, and independent state. They may alter or abolish the constitution and form of government whenever they deem it necessary.

5

With these principles in mind, we now consider the issues raised on appeal.

## Issue 1

Did the District Court err in concluding that Counts II and V of the amended complaint were not time-barred under § 3-5-302(6)(a), MCA?

Counts II and V of plaintiffs' amended complaint allege that there are constitutional prohibitions against putting Chapter 634 to a public vote, which claims do not involve the issue of suspension of the law prior to the election. Secretary of State Cooney argues that these counts of the complaint are barred under § 3-5-302(6)(a), MCA, because the claims raised therein were not filed within 30 days after the ballot issue was certified to the Governor, on September 3, 1993.

On September 27, 1993, defendants Natelson and Montanans for Better Government filed a petition for declaratory judgment in this Court. They named as defendants Montanans for Responsible Government, P.A.C., and the State of Montana, and asked for a declaratory judgment that the suspension of Chapter 634 and its placement on the ballot did not violate federal or state constitutional provisions. Pursuant to order of this Court, responses were filed by the same counsel who appear in the present case on behalf of the plaintiffs and the Montana Secretary of State. This Court dismissed the action for declaratory judgment, without substantive discussion, on October 14, 1993.

As stated above, the present action was filed four days later,

on October 18, 1993. The District Court ruled that the statute of limitations as to Counts II and V of the amended complaint was equitably tolled during the pendency of the declaratory judgment action.

The doctrine of equitable tolling of a statute of limitations applies when a claimant in good faith pursues one of several possible legal remedies and meets three criteria: (1) timely notice to the adverse party within the applicable statute of limitations in filing the first claim; (2) lack of prejudice to the adverse party in gathering evidence to defend against the second claim; and (3) good faith and reasonable conduct by the claimant in filing the second claim. Harrison v. Chance (1990), 244 Mont. 215, 228, 797 P.2d 200, 208. Cooney does not claim any deficiencies concerning the three criteria listed in Harrison. Rather, he asserts that equitable tolling is not available here because the plaintiffs were not the ones who filed the "first claim," the action for declaratory judgment in this Court. He cites Erickson v. Croft (1988), 233 Mont. 146, 760 P.2d 706, in which this Court quoted a California case describing equitable tolling as available where an injured person has several legal remedies and, reasonably and in good faith, pursues one.

Cooney's argument is not persuasive. In this case, there has been no showing of lack of notice or of prejudice to any party. The plaintiffs filed this action in District Court promptly after the action for declaratory judgment was dismissed by this Court. In this instance, where some defendants attempted to bypass the

7

District Court by filing an original proceeding in this Court, and where this Court ordered responses to the arguments on the issues, we will not impose a requirement that the plaintiffs should have second-guessed that the action in this Court would ultimately be dismissed.

We conclude the plaintiffs should not be penalized because of the premature attempt by some of the defendants to have this Court resolve the same or similar issues as those raised in this action. We hold that the District Court did not err in ruling that Counts II and V of the amended complaint are not time-barred, under the doctrine of equitable tolling.

## Issue 2

Does the suspension of Chapter 634 pending a referendum vote deny equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and Article II, Section 4 of the Montana Constitution?

Plaintiffs' argument is based upon their interpretation of several reapportionment cases, most notably Reynolds v. Sims (1964), 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506. Reynolds was a case concerning apportionment of legislative districts for the Alabama legislature. Despite Alabama's constitutional requirements for legislative representation based on population and for decennial reapportionment, the 1900 census still formed the basis for the existing state legislative apportionment in 1961, when the complaint in Reynolds was filed. The complaint alleged serious discrimination against voters in counties whose populations had

8

grown proportionately more than others since the 1900 census. In affirming a holding that plaintiffs had proven a violation of the Equal Protection Clause, the Court stated:

> [R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative body. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature.

Reynolds, 377 U.S. at 565.

Plaintiffs argue that the suspension of Chapter 634 through the initiative of a small minority of electors violates this principle. They maintain that "[i]f a minority can negate a legislative act carried out through the body representing the will of the majority, the principles of equal representation -- upon which both our state and federal governments rest -- are rendered void."

The authority cited by the plaintiffs is not dispositive of this case, nor is their argument persuasive. Unlike the reapportionment cases, this is not a case concerning access to the legislative process. Nor have plaintiffs met the requirement under traditional equal protection analysis of demonstrating that any class or segment of the population has been "fenced out" of the referendum process.

Here, the majority, through a constitutional referendum provision, has affirmatively granted certain powers to a minority.

The majority retains the power to eliminate the referendum provision from the Montana Constitution or to amend it to increase the numbers of signatures needed to put a referendum on the ballot or to suspend a law through the referendum process. "[T]here is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue." Gordon v. Lance (1971), 403 U.S. 1, 6, 91 S.Ct. 1889, 1892, 29 L.Ed.2d 273, 276.

Additionally, and critically, the referendum process is not yet complete in the present case. All Montana voters will have the opportunity to vote on Chapter 634 in the November 1994 general election. The majority of the voters at that election will decide the fate of Chapter 634. Therefore, the referendum process is not comparable, as plaintiffs attempt to argue, to a veto power given to a small group.

Article III, Section 5 of the Montana Constitution expresses the will of the majority in Montana on the matter of allowing referenda to be placed on the ballot and allowing the suspension of laws which are referred to the people. We hold that the District Court did not err in ruling that plaintiffs have failed to demonstrate any violation of their right to equal protection under the law.

## Issue 3

Does the suspension of Chapter 634, which placed the state's budget out of balance, violate Article VIII, Section 9 of the Montana Constitution?

10

Article VIII, Section 9 of the Montana Constitution provides: "**Balanced budget.** Appropriations by the legislature shall not exceed anticipated revenue." Plaintiffs point out that Montana's budget went out of balance when Chapter 634 was suspended, because appropriations made by the 1993 legislature then significantly exceeded the anticipated revenues for the biennium. They argue that harmonizing the referendum provision with the balanced budget provision requires a conclusion that general revenue bills are off limits to the referendum process.

We disagree. Article VIII, Section 9 places a restriction on the legislature, not on the people. The contention that it is inconsistent with the operation of the suspension provision in this case is groundless.

The reaction of the executive and legislative branches in calling a special session of the legislature to deal with an unforeseen decline in revenue (or increase in expenditures) might have been prompted by any number of causes. See, e.g., State v. Erickson (1933), 93 Mont. 466, 473, 19 P.2d 227, 229. Calling a special session to reconcile expenditures with anticipated revenues was entirely proper. The purpose of the balanced budget provision is therefore fully compatible with operation of the referendum process.

We hold that the District Court was correct in ruling that plaintiffs have shown no violation of Article VIII, Section 9 of the Montana Constitution.

Issue 4

Does Chapter 634 constitute an appropriations measure on which a referendum vote is prohibited?

This argument refers to the prohibition in subsection (1) of the referendum clause: "The people may approve or reject by referendum any act of the legislature except an appropriation of money." (Emphasis added.) The plaintiffs argue that Chapter 634 constitutes an appropriation of money because it is a general revenue measure which is "inextricably tied" to appropriations legislation and is used to balance Montana's state budget. They contend that the referendum provision cannot be read in isolation, but must be harmonized with other constitutional provisions, including the balanced budget requirement discussed above. Plaintiffs cite cases in which courts in Maryland and Michigan have interpreted the meaning of the word "appropriation" as used in their state constitutions in relation to specific referenda measures in those states.

The definition of "appropriation" under the above provision in Montana's Constitution is well-established and quite limited. A long line of Montana cases has established that "appropriation" refers only to the authority given to the legislature to expend money from the state treasury.

> "Appropriation" means an authority from the law-making body in legal form to apply sums of money out of that which may be in the treasury in a given year, to specified objects or demands against the state.

State v. Dixon (1921), 59 Mont. 58, 78, 195 P. 841, 845. See also Board of Regents of Higher Education v. Judge (1975), 168 Mont.

433, 543 P.2d 1323.

In the present case, the District Court stated,

Since Chapter 634 does not relate to the actual use or expenditure of money, the Court concludes it is not an act for the appropriation of money, and therefore, it is not excluded from the referendum process.

We agree with the District Court. Chapter 634 is a pure revenue-raising measure, and contains no provisions for expenditures. It was offered, debated, and voted upon separately from appropriation bills considered by the 1993 Montana legislature. We hold that Chapter 634 does not constitute an appropriations measure on which a referendum vote is prohibited.

## Issue 5

Does suspension of Chapter 634 constitute a surrender and suspension of the taxation power in violation of Article VIII, Section 2 of the Montana Constitution?

In this argument, plaintiffs refer to the provision of the Montana Constitution that "[t]he power to tax shall never be surrendered, suspended, or contracted away." Plaintiffs argue that this specific prohibition controls over the general right of the people to suspend the effect of legislation under the referendum power. They also argue that Referendum 112 has resulted in a surrender of the power to tax to a small minority of Montanans.

As under Issue 4, the plaintiffs have cited cases from two other states in which similar state constitutional provisions have been interpreted in relation to exercises of the referendum power reserved to the people of those states. Because we conclude that the language of our Constitution is clear on its face, we decline

13

to adopt, extend, and apply the reasoning of those cases to the language of the Montana Constitution and to the facts of this case.

Plaintiffs fail to distinguish between a tax measure and the taxing power. There has been no surrender or suspension of the taxing power; Referendum 112 has merely resulted in the suspension and referral of one measure by which the taxing power is exercised. As the District Court pointed out, the State of Montana is still collecting taxes, and will continue to do so; under Chapter 634, if the voters approve it, or under the law in existence prior to the legislative enactment of Chapter 634, if the voters reject it. We hold that the plaintiffs have failed to establish any violation of the prohibition against suspension or surrender of the taxing power.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

14

Justice James C. Nelson concurs in part and dissents in part:

While I concur in the Court's discussion of Issues 2 through 5 and with the result reached in its opinion on those issues, I respectfully dissent from the discussion on Issue 1 and from the conclusions expressed therein. I would hold that Counts II and V of plaintiffs' amended complaint are time-barred by reason of the applicable statute of limitation, § 3-5-302(6)(a), MCA, which, in pertinent part, requires that:

> ...a contest of a ballot issue submitted by ... referendum may be brought prior to the election only if it is filed within 30 days after the date on which the issue was certified to the governor, as provided in 13-27-308, ... .

Here, it is undisputed that plaintiffs' complaint was <u>not</u> filed within 30 days after the date on which the issue was certified to the governor. It is also undisputed that there was absolutely no legal reason or bar that would have prevented plaintiffs from filing their complaint within the time period allowed by the statute. Importantly, the Natelson/Montanans for Better Government petition for declaratory judgment filed as an original proceeding in and subsequently dismissed by this Court (Natelson action), did not in any way prevent or prohibit the timely filing of plaintiffs' complaint, and no legitimate argument to the contrary has been advanced here.

At the outset, I note that this Court has in the past, looked disfavorably on pre-election attempts to invalidate ballot issues and has required strict compliance with the procedures and time limits statutorily mandated by the legislature in mounting such challenges. <u>See,</u> State ex rel. Boese v. Waltermire (1986), 224

15

Mont. 230, 234, 730 P.2d 375, 377-78. Given that Montana's election laws are replete with numerous strict deadlines governing the election process, it only makes sense to protect the administration of that process and the election itself from disruptive litigation which might ultimately serve to frustrate the right of the people to vote.

No sound reason has been advanced here as to why we should back away from that general principle. While invoking the doctrine of equitable tolling may be appropriate when applying the doctrine would effectuate the policies and purposes underlying the statute of limitations, see, Hosogai v. Kadota (Ariz. 1985), 700 P.2d 1327, 1331, in pre-election challenge cases, invoking the doctrine actually encourages such challenges and tends to defeat the purposes and policy behind the statute of restricting such challenges.

Notwithstanding that plaintiffs' claims may be important and interesting,

> [t]he statute of limitations is explicit. By the letter of the law, the late filing was fatal to plaintiffs' claim. We will not resurrect a complaint which was not properly brought before the court. ...
> * * * *
> The statute of limitations does not discriminate between the just and unjust claim. The statute does represent legislative and public policy controlling the rights of potential litigants. In balancing these rights, the legislature placed the fulcrum precisely at [30 days] -- no more, no less.

Schaffer v. Champion Home Builders Co. (1987), 229 Mont. 533, 536-37, 747 P.2d 872, 874, (statute of limitations barred plaintiffs' wrongful death and survival actions when filed one day late.) With

16

that principle in mind, we have been reluctant to judicially alter, change or lessen statutory limits for the commencement of actions, Schaffer, 747 P.2d at 874, or to expand tolling doctrines. See, Bestwina v. Village Bank (1989), 235 Mont. 329, 334, 767 P.2d 338, 341.

Accordingly, in the instant case, the basis on which we have chosen to ignore the statute of limitations -- equitable tolling -- is not only judgmentally unsound, but, as discussed below, having also distorted the elements of the doctrine itself, its application in this case is legally insupportable.

In Erickson v. Croft (1988), 233 Mont. 146, 760 P.2d 706, we discussed, but, on the basis of the facts of that case, did not recognize or adopt the doctrine of equitable tolling. Citing case law from other jurisdictions we described the elements of the doctrine as follows:

> [C]ourts have adhered to a general policy which favors relieving plaintiff from the bar of a limitations statute when, possessing several legal remedies he, reasonably and in good faith, pursues one designated to lessen the extent of his injuries or damage. (Emphasis added).

Erickson 760 P.2d at 708.

The three requirements referenced by this Court to justify the applicability of equitable tolling in the instant case were also mentioned in Erickson. Those criteria are, unfortunately, misstated in the opinion here. In Erickson, citing Collier v. City of Pasadena (1983), 142 Cal.App.3d 917, 191 Cal.Rptr. 681, 685, we listed the three requirements as follows:

> (1) timely notice to the defendant [within the applicable statute of limitations] in filing the first claim;

17

(2) lack of prejudice to the <u>defendant</u> in gathering evidence to defend against the second claim; and
(3) good faith and reasonable conduct by the <u>plaintiff</u> in filing the second claim.   (Emphasis added.)

<u>Erickson</u>, 760 P.2d at 708.

While declining to recognize equitable tolling in <u>Erickson</u>, we subsequently expressed some willingness to apply the doctrine when the <u>Erickson</u> requirements appeared to have been met.   In Harrison v. Chance (1990), 244 Mont. 215, 797 P.2d 200, citing to the same three criteria as set forth in <u>Erickson</u>, we invoked the doctrine in order to allow a claimant to refile before the Human Rights Commission her claim which had become time-barred because she had erroneously, but in good faith, first filed in district court in reliance on previous case law which subsequently was legislatively overruled.   <u>Harrison</u>, 797 P.2d at 208.

As referred to in <u>Harrison</u>, the doctrine of equitable tolling contemplates as threshold requirements (a) an injured party (plaintiff or claimant) who (b) had several possible legal remedies and (c) pursued one of those remedies reasonably and in good faith. <u>Harrison</u>, 797 P.2d at 208.   Only if those threshold requirements are first met, is it then necessary to determine whether the injured party also meets the three additional criteria referred to, though misstated, in this Court's instant opinion.

The plaintiffs in this case do not meet the three threshold requirements for the application of the doctrine.   The plaintiffs here were not the plaintiffs in the Natelson action; they were the defendants.   The plaintiffs here did not reasonably and in good faith first pursue a particular remedy from several others

18

available to them; this is their first cause of action; they were defending the Natelson action. Quite simply, having failed to meet the threshold requirements for application of the doctrine of equitable tolling, we need not concern ourselves with whether plaintiffs comply with the remaining three criteria.

Moreover, in justifying the equitable tolling of the statute of limitations and the filing of plaintiffs' time-barred causes of action on the basis of the premature filing of the Natelson action, this Court has also ignored other well established precedent. While equitable tolling addresses the reasonableness and good faith of plaintiff's actions in bringing successive suits, tolling doctrines are much more restricted where, as here, it is the defendant's actions which are alleged to have been responsible for plaintiff's untimely filing of his claim.

We have allowed tolling of statutes of limitation on the basis of defendant's conduct only under narrowly defined circumstances unquestionably not at issue here: i.e. where there is a showing of fraudulent concealment by the defendant calculated to obscure the existence of plaintiff's cause of action and which lulls him into a false sense of security leading to his failure to timely initiate suit, Keneco v. Cantrell (1977), 174 Mont. 130, 136, 568 P.2d 1225, 1228; or where there is a relation of trust or confidence between the parties which imposes upon the defendant a duty of making full disclosure of the facts, Skierka v. Skierka Bros., Inc. (1981), 192 Mont. 505, 511, 512, 629 P.2d 214, 217-18.

In short, by misapplying and distorting the elements of the

doctrine of equitable tolling in this case, we have established some very bad precedent, indeed. Not only have we thrown the threshold requirements for application of the doctrine of equitable tolling out the window, but we have also significantly expanded the circumstances under which action by a defendant will toll the statute of limitations on a plaintiff's claim. Our decision on Issue 1 proves the old maxim that "hard cases make bad law." They do, and we have.

Failing to meet the threshold requirements to invoke the doctrine, I would hold that plaintiffs here are not entitled to equitable tolling of the running of the statute of limitations on Counts II and V of their amended complaint. I would reverse on that issue and, accordingly, I respectfully dissent from this Court's opinion on Issue 1.

_____
Justice

Justice Karla M. Gray joins in the special concurrence and dissent.

_____
Justice

20

Justice Terry N. Trieweiler dissenting.

I dissent from that part of the majority's opinion which concludes that the suspension of Chapter 634 did not violate the Federal and State Constitutions.

I conclude that when as few as eight percent of the State's voters can exercise an effective veto over legislation enacted by representatives who were elected by a majority of the State's voters; and when, based on that veto, services, benefits and educational opportunities are permanently lost by citizens who were denied any voice in the matter, then the principle of one equally weighted vote for each person is rendered meaningless and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Article II, Section 4, of the Montana Constitution, have been violated.

I furthermore conclude that when a referendum, by suspending a revenue-raising measure such as 1993 Montana Laws, Chapter 634, leaves the Legislature with no alternatives other than an unbalanced budget in violation of Article VIII, Section 9, of the Montana Constitution, or rescinding an appropriation of money already made, then the referendum is, in effect, one to reject an appropriation of money in violation of Article III, Section (5), of the Montana Constitution.

Finally, I conclude that Referendum 112, by suspending Chapter 634 which was enacted pursuant to the Legislature's power to tax, would unconstitutionally suspend that power in violation of Article VIII, Section 2, of the Montana Constitution.

21

Although these constitutional provisions are, of course, our foremost concern, I also conclude that the ramifications of the majority's decision will be devastating to the ability of future legislatures to provide for the obligations and services of State government. Because of this decision, government in the State of Montana will always be hostage to tyranny by a small minority who are easily misled by those unimaginative but ambitious persons who would exploit the universal disdain for taxation for their own political benefit.[1]

FACTUAL BACKGROUND

I find the following undisputed facts relevant to the conclusions I have reached:

1. House Bill 671 was passed by the Montana Legislature during the 1993 Legislative Session and was signed by the Governor on May 11, 1993. The measure revises state income tax and corporate tax laws. It increased income tax revenue, but shifts the income tax burden. It increases minimum corporate taxes and imposes graduated corporate tax rates.

2. House Bill 671 was passed, in part, for the purpose of raising revenues for the general operation of State government and balancing the state's budget.

3. House Bill 671 became effective after Montana voters rejected Senate Bill 235, which contained a four percent general sales tax, and was given retroactive application to January 1, 1993. . . .

---

[1] For example, to gather support for Referendum 112, Natelson claimed that the tax burden of Montanans was the eighth highest in the country, when, in reality, it is near the bottom - at 44th. According to figures from the U.S. Bureau of the Census, the only neighboring state where residents pay a lower percent of income in taxes is South Dakota, which is 45th among the states. However, Natelson failed to acknowledge the correct figures until after the necessary signatures were gathered in support of Referendum 112. (Mike Dennison, *Montana Tax Burden Much Lower Than Natelson Claims*, Great Falls Tribune (Montana), October 21, 1993, at 1A; Shirley Salemy, *Natelson Admits Knowing Tax Claim Was Shaky*, Great Falls Tribune (Montana), October 22, 1993, at 1A.)

4.    Defendants Natelson and Montanans for Better Government circulated the Petition Referendum 112 to place House Bill 671 on the ballot for the November 1994 general election.

5.    On September 3, 1993, Defendant Cooney certified to the Governor that he received petitions containing sufficient signatures to place House Bill 671 on the ballot for the November 1994 general election.

6.    On September 28, 1993, Defendant Cooney certified to the Governor that he received petitions containing sufficient signatures to require suspension of House Bill 671 until the vote on Referendum 112.

Stipulation of Facts entered into between the parties.

Based upon the Secretary of State's certification that sufficient signatures were gathered to suspend House Bill 671 (which was enacted as 1993 Montana Laws, Chapter 634), the Governor of the State of Montana, on October 8, 1993, issued a proclamation calling the 53rd Legislature for a special session.   In his proclamation he stated that:

WHEREAS, Article VIII, Section 9, of the Montana Constitution provides that appropriations by the Legislature shall not exceed anticipated revenue; and

WHEREAS, Article VI, Section 9, of the Montana Constitution provides that it is the responsibility of the Governor to recommend measures necessary to balance the budget; and

WHEREAS, a referendum undertaken pursuant to Article III, Section 5, of the Montana Constitution, has resulted in both the suspension of House Bill 671 and in its placement on the ballot for approval or rejection by the qualified electors on November 8, 1994; and

WHEREAS, the suspension of House Bill 671 has made its provisions inoperative, thereby making it virtually impossible to balance the state's budget without legislative action.

    . . . .

NOW, THEREFORE I, Marc Racicot, Governor of the State of Montana, pursuant to the authority vested in me by the Constitution and laws of the State of Montana do

23

hereby call the Fifty-Third Legislature into Special Session in Helena, at the State Capitol, at the hour of 9:00 A.M., the 29th day of November, 1993, and hereby direct the Special Session of the Fifty-Third Legislature to consider action on the following:

1.    Legislation to balance the state's budget and address appropriate personnel and operational issues.

. . . .

7.    Appropriations to state and local government and programs, allocation of revenue, accounting procedures and budget modifications for state and local government agencies . . . .

In other words, House Bill 671 was enacted to balance the state budget. When it was suspended, the budget was unbalanced and the Legislature was forced to meet and reduce appropriations.

The Legislature met in special session from November 29, 1993 through December 20, 1993. During this time, the Legislature cut $19 million that had been appropriated for public education in kindergarten through twelfth grade; $12.5 million which had been appropriated for human services; and $11.8 million which had been appropriated for higher education. (Office of the Legislative Fiscal Analyst, Appropriations Report 1995 Biennium, November 1993 Special Session (February, 1994) at summary page 2.)

EQUAL PROTECTION CLAUSE

The majority dispenses with the constitutional principle established in *Reynolds v. Sims* (1964), 377 U.S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506, that each person eligible to vote is entitled to cast an equally weighted vote with its conclusion that "[u]nlike the reapportionment cases, this is not a case concerning access to the legislative process." However, contrary to that conclusion,

access to the legislative process is exactly what this case is about.

This State's legislative representatives were elected by a majority of Montana's voters. In their representative capacity, a majority of those legislators enacted laws, including House Bill 671. However, their representative efforts were effectively vetoed by a small minority of voters who supported Referendum 112 without any opportunity by those who opposed Referendum 112 to cast a vote in opposition. The argument that those who oppose Referendum 112 will ultimately have an opportunity to express their view on November 8, 1994, is of little constitutional significance, considering the irreversible suspension of the majority's decision for the intervening 14 months.

To hold that *Reynolds* has no significance beyond legislative apportionment is to miss the important principle of "one equally weighted vote for each person" that it reaffirmed. While that principle was discussed in terms of representative government, that discussion was based on the historical principle that each person's vote in this country has historically been given effect through their elected representatives. The court in *Reynolds* stated:

> State legislatures are, historically, the fountainhead of representative government in this country. A number of them have their roots in colonial times, and substantially antedate the creation of our Nation and our Federal Government. In fact, the first formal stirrings of American political independence are to be found, in large part, in the views and actions of several of the colonial legislative bodies. With the birth of our National Government, and the adoption and ratification of the Federal Constitution, state legislatures retained a most important place in our Nation's governmental structure. But representative

25

government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less.

*Reynolds*, 377 U.S. at 564-65.

It is clear that what the Court in *Reynolds* found offensive to the Equal Protection Clause of the Fourteenth Amendment was minority control over legislative bodies. In that regard, the Court stated:

[A]nd to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. . . . And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged.

*Reynolds*, 377 U.S. at 565.

It is for these reasons that the Court majority in *Reynolds* made clear that while its discussion was couched in terms of representation, the principle with which it was really concerned was the right of each voter to participate equally in a representative democracy. For that reason, the Court explained that:

While the result of a court decision in a state legislative apportionment controversy may be to require restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any

26

discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote. Like *Skinner v. Oklahoma*, 316 U.S. 535, such a case "touches a sensitive and important area of human rights," and "involves one of the basic civil rights of man," presenting questions of alleged "invidious discriminations . . . against groups or types of individuals in violation of the constitutional guarantee of just and equal laws." 316 U.S. at 536, 541. Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. Almost a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356, the Court referred to "the political franchise of voting" as "a fundamental political right, because preservative of all rights." 118 U.S. at 370.

*Reynolds*, 377 U.S. at 561-62.

For these reasons, the Court in *Reynolds* held that legislative apportionment which diluted the weight of urban voters violated the Equal Protection Clause of the Fourteenth Amendment.

The State of Montana and the majority of this Court would contend on the one hand that the referendum process provided for in Article III, Section 5(2), of the Montana Constitution, is a continuation of the legislative process, and therefore, the result accomplished as a result of Referendum 112 was not a suspension of the power to tax held exclusively by the Legislature pursuant to Article VIII, Section 2, of the Montana Constitution. However, that argument finds no comfort in the *Reynolds* decision. The Supreme Court in *Reynolds* specifically held that a bicameral legislature in which only one house is apportioned according to population does

27

not satisfy the equal protection requirement. In language relevant to the circumstances in this case, the Supreme Court stated that:

> [W]e necessarily hold that the Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis. The right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens in the election of members of one house of a bicameral state legislature would amount to little if States could effectively submerge the equal-population principle in the apportionment of seats in the other house. <u>If such a scheme were permissible, an individual citizen's ability to exercise an effective voice in the only instrument of state government directly representative of the people might be almost as effectively thwarted as if neither house were apportioned on a population basis.</u> Deadlock between the two bodies might result in compromise and concession on some issues. But in all too many cases the more probable result would be frustration of the majority will through minority veto in the house not apportioned on a population basis, stemming directly from the failure to accord adequate overall legislative representation to all of the State's citizens on a nondiscriminatory basis. In summary, we can perceive no constitutional difference, with respect to the geographical distribution of state legislative representation, between the two houses of a bicameral state legislature. [Emphasis added].

*Reynolds*, 377 U.S. at 576.

Likewise, in this case the fact that both Montana's House of Representatives and Senate are apportioned on a population basis is of no benefit to the majority who elected them if a minority can routinely and effectively veto their efforts in a process which provides no opportunity for those who are opposed to the proposed referendum to cast their vote in opposition. In conclusion, I can comprehend no difference between the bicameral scenario prohibited in *Reynolds* and the referendum process permitted in this case. In each case, the will of the majority is effectively thwarted by a minority of voters.

28

The majority cites *Gordon v. Lance* (1971), 403 U.S. 1, 6, 91 S. Ct. 1889, 1892, 29 L. Ed. 2d 273, 276, for the principle that the will of the majority need not always prevail. However, the majority's citation is incomplete and oversimplifies the holding in *Gordon*. The challenge in that case was to a West Virginia statute which provided that a political subdivision could not incur bonded indebtedness nor increase tax rates beyond those established by the Constitution without the approval of 60 percent of the voters in a referendum election. While the Court held that requiring a super majority did not violate the Equal Protection Clause of the Fourteenth Amendment, the Court qualified its holding by stating that:

> We intimate no view on the constitutionality of a provision requiring unanimity or giving a veto power to a very small group. Nor do we decide whether a State may, consistently with the Constitution, require extraordinary majorities for the election of public officers.

*Gordon*, 403 U.S. at 8, n.6.

What the Court in *Gordon* refused to address is exactly the situation that exists in this case. Therefore, *Gordon* is no authority for the result arrived at by the majority.

Because the principles articulated in *Reynolds* are so clearly applicable to the situation in this case, I do not believe that further equal protection analysis is necessary, as is suggested in the majority opinion. For these reasons, I dissent from the majority's conclusion that the process by which Chapter 634 was

29

suspended does not violate the Equal Protection Clauses of our State and Federal Constitutions.

## BALANCED BUDGET

The majority opinion deals with Article VIII, Section 9, of the Montana Constitution which requires a balanced budget, and that part of Article III, Section 5, which prohibits referenda rejecting appropriations, in isolation, and thereby, concludes that neither prohibition was violated. However, in doing so, the majority opinion violates a cardinal rule of constitutional construction, which is that "*[a]ll of the provisions* of the Constitution bearing upon the same subject *are to receive appropriate attention and be construed together.*" *Board of Regents v. Judge* (1975), 168 Mont. 433, 444, 543 P.2d 1323, 1330. For that reason, in *Board of Regents*, 543 P.2d at 1330, we held that our task is to harmonize in a practical manner those provisions of the Constitution which would otherwise be in apparent conflict. The majority opinion fails to do so.

On the one hand, the majority concludes that Referendum 112 did not cause an unbalanced budget because the Legislature exercised its only alternative which was to come into special session and cut appropriations. On the other hand, the majority concludes that Referendum 112 did not affect appropriations since it did not directly prohibit the expenditure of money. By isolating its consideration of these separate provisions, the majority has failed to harmonize in a practical manner the various provisions of the State Constitution.

30

The practical effect of Referendum 112 is that the Legislature was left with one of two alternatives. It could either leave the budget unbalanced in violation of Article VIII, Section 9, or it was forced to reduce expenditures in violation of the prohibition found in Article III, Section 5(1). Considering the practical effect of Referendum 112 and harmonizing the provisions of Montana's Constitution requires the conclusion that under the facts in this case, the referendum was a rejection of the appropriation of money, and therefore, unconstitutional pursuant to Article III, Section 5(2). This conclusion finds support in other jurisdictions under similar circumstances and based on similar constitutional provisions.

Other states which have considered similar constitutional restrictions on referenda to protect appropriations passed by the Legislature have held that when appropriation bills, such as House Bill 2 from the 1993 regular legislative session, are dependent on revenue bills, such as House Bill 671, then the bills must be read in *pari materia* for purposes of determining whether they may be referred, and that where they are interdependent, revenue bills may not be referred for a vote. *Winebrenner v. Salmon* (Md. 1928), 142 A. 723; *Dorsey v. Petrott* (Md. 1940), 13 A.2d 630; *Kelly v. Marylanders for Sports Sanity, Inc.* (Md. 1987), 530 A.2d 245; *County Road Assoc. v. Board of State Canvassers* (Mich. 1979), 282 N.W.2d 774.

In *Dorsey*, 13 A.2d at 637, the Maryland Court reasoned:

It follows that revenue measures to raise the public funds to pay the appropriations of the Budget Bill are

31

excepted from the operation of the Referendum Amendment, although the revenue thus procured is disbursed by the Treasury through the provisions of the Budget without any express authorization in the money bill for its disbursement.

Likewise, in this case, House Bill 671 cannot be considered in a vacuum. Its enactment was interrelated with the appropriations enacted in the 1993 regular session of the Legislature, and those appropriations depended upon the revenue that it raised. The effect of Referendum 112's suspension of House Bill 671 was to also reject those appropriations which were dependent on the revenue that it generated.

For these reasons, I conclude that Referendum 112 did, in fact, reject an act of the Legislature for appropriation of money, and therefore, was unconstitutional in violation of Article III, Section 5(1), of the Montana Constitution.

## SUSPENSION OF POWER TO TAX

Article VIII, Section 2, of the Montana Constitution specifically provides that "the power to tax shall never be . . . suspended." Chapter 634 was enacted by the Legislature pursuant to its power to tax. However, Chapter 634 was suspended pursuant to Referendum 112. The majority concludes that the Legislature's power was unaffected, even though the tax that it enacted pursuant to that power has been suspended. The logic of this conclusion escapes me. What is the practical purpose of the power to tax if actual taxes levied pursuant to that power can be freely suspended pursuant to the whim of a small minority of voters?

32

To me, the language of Article VIII, Section 2, is clear. It prohibits exactly what was accomplished by Referendum 112 in this case.

While Article III, Section 5(2), does provide for the suspension of an act of the Legislature by 15 percent of the qualified voters in a majority of the representative districts, that provision of the Constitution (even if the exception for appropriation measures is not considered), is a general provision. The prohibition against suspension of the Legislature's taxing power found at Article VIII, Section 2, is a specific prohibition. Whether talking about legislation or constitutional provisions, the specific control over the general. *Grossman v. State Dept. of Natural Resources* (1984), 209 Mont. 427, 682 P.2d 1319.

Therefore, I conclude that Referendum 112 violated Article III, Section 2 of the Montana Constitution and dissent from the majority's conclusion to the contrary.

## STATUTE OF LIMITATIONS

Although I dissent from the majority's conclusion that Referendum 112 was constitutional, I concur with the majority's conclusion that plaintiff's complaint was not barred by the statute of limitations found at § 3-5-302(6)(a), MCA.

The principle of equitable tolling is based on principles of fairness and common sense which apply equally in this situation as where two successive actions are brought by the same party. The dissenting opinion of Justices Nelson and Gray, to the effect that it cannot be applied because the original action was, in fact,

33

brought by Natelson and the second action was brought by Nicholson, even though the issues involved were the same, and even though common sense required resolving the first action before filing the second action, exalts form over substance. The approach taken by the dissenters is unduly mechanical and without regard for the equitable principles which are being invoked. In short, I find that the dissenting opinion on this subject is the antithesis of equity.

For these reasons, I concur with the majority's conclusion that the statute of limitations was equitably tolled.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent.

_____
Justice

34