**G. VALERIA, through her parent and next friend; G. Yolanda; Rosalinda O., through her parent and next friend; Marta O.; Elizabeth S., through her parent and next friend; Jose S., Plaintiffs,**

---

One Nation/One CA; Las Familias Del Pueblo; Gloria Matta Tuchman; Nancy L., through her parent and next friend, N.L.; Lisa L., through her parent and next friend, N.L.; Sylvia Martinez; Petra Ramirez; Angelina Morfin; Cruz Mejia; Emerita Carrillo; Ofelia Bueno; Center for Equal Opportunity, Intervenors,

and

J.W.P., through her parent and next friend; Angel V.; David R., through his parent and next friend; Hilda M.; Maria M.; O.G., through his parent and next friend; Dora G.; Mujeres Unidas Y Activas; Parents for Unity; Chinese for Affirmative Action; California Latino Civil Rights Network; National Council of La Raza; Southern Christian Leadership Conference of Greater Los Angeles County, Plaintiffs–Appellants,

Sarina Frias, Intervenor–Appellee,

v.

Gray DAVIS; State Board of Education; Yvonne W. Larsen; Robert L. Trigg; Timothy C. Draper; Kathryn Dronenberg; Marion Joseph; Megan Kephart; Marion McDowell; Janet Nicholas; Gerti B. Thomas; Marina Tse; Delaine Eastin, in her official capacity as the State Superintendent of Public Instruction; Marion Bergeson; Susan Hammer; Reed Hastings; Nancy Ichinaga; Carlton J. Jenkins; Monica Lozano; Vicki Reynolds; Nickolas C. Rodriguez, Defendants–Appellees.

* Honorable John W. Sedwick, United States District Judge for the District of Alaska, sitting by designation.

No. 01–15219.

United States Court of Appeals, Ninth Circuit.

Feb. 25, 2003.

Before: HUG and TASHIMA, Circuit Judges, and SEDWICK, District Judge.*

Order; Dissent by Judge PREGERSON.

## ORDER

The panel has voted to deny the petition for panel rehearing. Judge Tashima votes to deny the petition for rehearing en banc and Judges Hug and Sedwick so recommend.

The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing, but a majority of the nonrecused, active judges failed to vote in favor of rehearing en banc.**

The petition for panel rehearing and the petition for rehearing en banc are denied.

PREGERSON, Circuit Judge, with whom PAEZ, Circuit Judge, joins, dissenting from the denial of rehearing en banc:

The panel's opinion holds that Proposition 227 on its face does not violate the Equal Protection Clause of the Fourteenth Amendment. In addition to reaching an incorrect legal conclusion, the decision has the effect of drumming out of existence a clearly articulated mode of equal protection analysis. The Supreme Court formulated and applied a "political structure" equal protection analysis in *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), and *Washington v.*

** Judge Reinhardt was recused.

*Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), rather than a "conventional" equal protection analysis. While a conventional equal protection analysis looks to a suspect classification and intentional discrimination, or a classification implicating a fundamental right, political structure equal protection analysis concerns a restructuring of the political process with a racial focus. *Compare Seattle,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), *and Hunter,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), *with Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) *and Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Proposition 227's reallocation of political power with respect to an issue with a racial focus violates the Constitution under *Hunter* and *Seattle.* The initiative, passed by California voters in 1998, effectively eliminated bilingual instruction in California public schools. Now part of the California Education Code, Proposition 227 restructures the political process by shifting authority over bilingual education from local educational agencies to the state. Before the passage of Proposition 227, public school students and their parents could effect change at the local level. Now they must launch a successful statewide ballot initiative to bring about any meaningful modification in bilingual education policy. By affecting *only* those interested in bilingual education, this political restructuring violates the "political structure" equal protection doctrine announced in *Hunter* and *Seattle.*

Although the panel seems to approach the "political structure" and "conventional" equal protection analyses as distinct, its discussion and application of the "political structure" equal protection claim lead ineluctably to a nullification of that doctrine. By requiring "evidence of purposeful racial

discrimination" in the political structure analysis, *Angel V. v. Davis,* 307 F.3d 1036, 1040 (9th Cir.2002), the panel mutes the distinction between that framework and conventional equal protection analysis. Because the panel's decision effectively eliminates the political structure equal protection doctrine, thereby contradicting United States Supreme Court and Ninth Circuit precedent, this case should have been reheard en banc.

I.

Under *Hunter* and *Seattle,* a "political structure" equal protection violation has only two elements: (1) a restructuring of the political process in a limited issue area; and (2) a "racial focus" to the restructuring, in that it affects only a program that "at bottom inures primarily to the benefit of the minority, and is designed for that purpose." *See Seattle,* 458 U.S. at 469–74, 102 S.Ct. 3187. A restructuring of the political process under the Hunter–*Seattle* doctrine is a reallocation of political power that makes it more difficult to effect change in a limited issue area. In *Hunter,* the Supreme Court held that an amendment to the Akron, Ohio city charter "prevent[ing] the city council from implementing any ordinance dealing with racial, religious, or ancestral discrimination in housing without the approval of the majority of the voters of Akron" violated the Equal Protection Clause. *Hunter,* 393 U.S. at 386, 89 S.Ct. 557. The amendment not only gutted the existing ordinance prohibiting housing discrimination, "but also required the approval of the electors before any future ordinance could take effect." *Id.* at 389–90, 89 S.Ct. 557.

This "political structure" equal protection analysis was articulated further in *Seattle,* in which a school district challenged the constitutionality of a Washington statute adopted by initiative. The law, Initia-

tive 350, prohibited school boards from requiring any student to attend a school other than the school physically nearest or next nearest her home, but contained exceptions for essentially every aspect of district policy except racial integration. In so doing, the initiative "removed from local school boards their existing authority, and in large part their capacity, to enact programs designed to desegregate the schools." *Seattle Sch. Dist. No. 1 v. Washington,* 633 F.2d 1338, 1344 (9th Cir.1980).

The city charter amendment in *Hunter* and the statewide voter initiative in *Seattle* did not violate equal protection merely because they restructured the political process. They violated equal protection because the shifts in the political process concerned *only* issues that pertained to race.[1] In *Hunter,* "the state obstructed equal housing by removing only racially fair housing prerogatives from the lawmaking procedure for all other housing matters." *Coalition for Econ. Equity v. Wilson,* 122 F.3d 692, 706 (9th Cir.1997) ("CEE"). In *Seattle,* the Court held that Initiative 350 effected "a reallocation of power of the kind condemned in *Hunter* . . . [by removing] the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." *Seattle,* 458 U.S. at 474, 102 S.Ct. 3187.

In *Hunter,* the Court reasoned that the political restructuring "drew a distinction between those groups who sought the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends." *Hunter,* 393 U.S. at 390, 89 S.Ct. 557. Consequently, the amendment "made it substantially more difficult to secure enactment of ordinances" to prevent housing discrimination on the bases of race, religion, and ancestry. *Id.* The *Hunter* Court further observed that while the amendment was facially neutral, "the reality is that the law's impact falls on the minority." *Id.* at 391, 89 S.Ct. 557. The Court determined that the law "places special burden on racial minorities within the governmental process . . . [which] is no more permissible than denying them the vote, on an equal basis with others." *Id.* (citing *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)).

The Court in *Seattle* observed that minorities may consider the policy favoring desegregative busing to be "legislation that is in their interest," *Seattle,* 458 U.S. at 474, 102 S.Ct. 3187 (quoting *Hunter,* 393 U.S. at 395, 89 S.Ct. 557), and on this basis concluded that Initiative 350 had a "racial focus" sufficient to trigger the *Hunter* doctrine:

> It is undeniable that busing for integration . . . now engenders considerably more controversy than does the sort of fair housing ordinance debated in *Hunter.* But in the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be resolved through the political process. For present purposes, *it is enough that minorities may consider busing for integration to be legislation that is in their interest. Given the racial focus of Initiative 350, this suffices*

1. *Cf. Gordon v. Lance,* 403 U.S. 1, 5, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971) ("The class singled out in *Hunter* was clear—'those who would benefit from laws barring racial, religious, or ancestral discriminations' ") (quoting *Hunter,* 393 U.S. at 391, 89 S.Ct. 557);

*Wellwood v. Johnson,* 172 F.3d 1007, 1010 (8th Cir.1999) (political structure claim is valid "when an independently identifiable class ha[s] an interest in the *issue* discriminated against") (emphasis added).

*to trigger application of the Hunter doctrine.*

*Seattle,* 458 U.S. at 474, 102 S.Ct. 3187 (citations and quotations omitted) (emphasis added). Because the "political process or the decisionmaking mechanism used to *address* racially conscious legislation [was] singled out for peculiar and disadvantageous treatment," *id.* at 458, 102 S.Ct. 3187, Initiative 350 failed to pass constitutional muster. Therefore, the Court struck down the law in *Seattle* not solely because it worked "a major reordering of the State's educational decisionmaking process," *id.* at 479, 102 S.Ct. 3187, but because it also contained an impermissible "racial focus." *Id.* at 474, 102 S.Ct. 3187. Similarly, the Court struck down the city ordinance in *Hunter* because it selectively restructured the housing regulatory authority only with respect to enacting ordinances to regulate real estate transactions on the basis of race, religion, or nationality. Thus, the two conditions necessary to trigger the Hunter–Seattle doctrine are a restructuring of the political process in a way that makes it harder to enact legislation respecting a particular issue and a racial focus to that issue. *Id.* at 474, 479, 102 S.Ct. 3187.

## II.

Proposition 227 generates the type of restructuring of the political process that runs afoul of the equal protection guarantees of the Fourteenth Amendment. Proposition 227 siphons power away from those minorities who are directly affected by bilingual education policy and transfers the power to influence that area of educational policy to ʼthe general electorate. While public school students and parents could influence policy at the local level before the passage of Proposition 227, they must now launch a successful statewide ballot initiative to bring about any meaningful change. Requiring the affected minority to navigate this remote and amorphous level of governmental decisionmaking to effect any change in bilingual education policy undoubtedly "mak[es] it more difficult for certain racial . . . minorities . . . to achieve legislation that is in their interest." *Seattle,* 458 U.S. at 470, 102 S.Ct. 3187.

Proposition 227 radically restructures the political process regarding the education of non- and limited-English-proficient ("N/LEP") students. Indeed, the *Angel V.* panel concedes that "Proposition 227 surely reallocated political authority, placing control over bilingual education at the state (rather than local) level. . . ." *Angel V.,* 307 F.3d at 1041. Not only does Proposition 227 prescribe a specific instructional model for N/LEP students in public schools, it also embeds that prescription by restructuring the process for future policymaking. *Cf. Hunter,* 393 U.S. at 389–90, 89 S.Ct. 557 (criticizing restructuring of the political process that made it more difficult for affected minorities to enact legislation in their interest).[2] Before the passage of Proposition 227, public school students and their parents could

---

**2.** While it is true that Article 3 of the law provides for "parental exceptions," those exceptions are circumscribed to such an extent that parents and students are effectively left with very little discretion. Moreover, the fact that *individual* waivers from English immersion might be available has no bearing on the question of whether Proposition 227 restructures the political process with respect to bilingual education policy. *Hunter* and *Seattle* protect "governmental power," *see Seattle,*

458 U.S. at 470, 102 S.Ct. 3187, in ensuring minorities a fair chance to influence public policy in areas that have a racial focus, not individual remedies. *See also CEE,* 122 F.3d at 714 (NORRIS, J., respecting the denial of rehearing en banc) ("[T]he 'equality' that the *Hunter–Seattle* doctrine secures is the equality of opportunity that the Constitution guarantees to minority groups to use the channels of representative government to 'achieve legislation that is in their interest.' ").

effect change at the local level. Now, one must mount a statewide voter initiative campaign to effect any meaningful change in bilingual education policy,[3] an undertaking so burdensome that it renders the option unrealistic.[4]

Despite its facial neutrality, Proposition 227 violates equal protection because it restructures the political process only with respect to bilingual education, an area with a racial focus.[5] In *Seattle,* the challenged initiative applied to students who were bused for desegregation purposes—an ostensibly neutral group. However, the Court in that case nonetheless struck the initiative down as unconstitutional, because the political restructuring had a racial focus. In the context of Proposition 227, there should be no question that bilingual education entails a racial focus; the fact that laws relating to N/LEP student instruction necessarily have a racial focus is sufficient to trigger the *Hunter–Seattle* doctrine. *See Seattle,* 458 U.S. at 474, 102 S.Ct. 3187. The *Angel V.* panel acknowl-

edges "an undeniable racial dimension to Proposition 227," supporting that statement with statistics indicating that "nearly every LEP student in California is either Latino or Asian/Pacific Islander." *Angel V.,* 307 F.3d at 1041 n. 6. Notwithstanding the fact that, in the 1996–1997 academic year, 82 percent of N/LEP students were Hispanic/Latino, the panel concludes that "Proposition 227 operated solely to address an educational issue, *not* a racial one." *Angel V.,* 307 F.3d at 1041 (emphasis in original). Under this reasoning, Initiative 350 in *Seattle* might similarly have been construed as representing "an educational issue, not a racial one." Yet the Supreme Court in *Seattle* recognized a racial focus to Initiative 350, and struck it down.

If Proposition 227 were to have worked a reordering under which all educational issues must be addressed by statewide voter initiative (i.e., no racial focus) there would no equal protection violation. Likewise, were Proposition 227 a mere repeal,

3. The district court was imprecise in finding without qualification that one could also amend the law by obtaining a two-thirds majority in the state legislature. *See Valeria G. v. Wilson,* 12 F.Supp.2d 1007, 1025 (C.D.Cal. 1998). Section 335 of Proposition 227 provides that the requirements of the law may only "be amended by a statute that becomes effective upon approval by the electorate or by a statute *to further the act's purpose* passed by a two-thirds vote of each house of the Legislature and signed by the Governor." Cal. Educ.Code § 335 (emphasis added). If the "general thrust of the initiative is to reject the bilingual education programs presently in effect in California public schools," *Valeria G.,* 12 F.Supp.2d at 1012, then the ability to enact a statute designed to "further the act's purpose" could hardly be said to afford any meaningful policy intercession.

4. *See CEE,* 122 F.3d at 713 (NORRIS, J., respecting the denial of rehearing en banc) ("It is hard to imagine a more onerous burden in the political process than mounting a statewide initiative campaign.").

5. While the text of Proposition 227 might not contain an expressly racial classification, "[i]n 'reality,' the burden imposed by such an arrangement necessarily 'falls on the minority.'" *Seattle,* 458 U.S. at 468, 102 S.Ct. 3187 (quoting *Hunter,* 393 U.S. at 391, 89 S.Ct. 557). The Court in *Hunter* and *Seattle* struck down laws because they restructured the political process in such a way as to make it more difficult for minorities to legislate in their interest. Proposition 227 similarly denies the guarantee of equal protection because, "[i]n effect," the law "serves[s] as an 'explicitly racial classification treating racial [educational] matters differently from other racial and [education] matters.'" *See Seattle,* 458 U.S. at 468, 102 S.Ct. 3187 (quoting *Hunter,* 393 U.S. at 389, 89 S.Ct. 557). "This [draws] an impermissible distinction 'between the treatment of problems involving racial matters and that afforded other problems in the same area.'" *Id.* at 469, 102 S.Ct. 3187 (quoting *Lee v. Nyquist,* 318 F.Supp. 710, 718 (W.D.N.Y.1970), *aff'd without opinion,* 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971)).

rejection, or replacement of an educational policy favoring bilingual education in N/LEP student instruction, without the additional anchor of requiring affected minorities to surmount a significantly higher electoral bar (i.e., no restructuring), there would be no equal protection violation. As it stands, however, Proposition 227 creates a political structure that has the consequence of making it substantially more difficult to effect change with respect to an issue with a racial focus.[6] Therefore, because Proposition 227:(1) restructures the political process and (2) only with respect to an area of educational policy that has a racial focus, the statute violates the Equal Protection Clause under *Hunter* and *Seattle*.

### III.

Both the Supreme Court and the Ninth Circuit have recognized that there is a separate "political structure" equal protection doctrine. *Romer v. Evans*, 517 U.S. 620, 625–26, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *CEE*, 122 F.3d at 701. Yet the *Angel V.* panel's interpretation and application of the political structure doctrine renders the doctrine superfluous. The panel holds that a showing of racial animus or discriminatory intent is necessary to vindicate a claim of a political structure equal protection violation. *Angel V.*, 307 F.3d at 1040. Both restructuring and a racial focus are necessary under the *Hunter–Seattle* doctrine because neither alone would independently trigger strict scrutiny under conventional equal protection analysis. Were either element sufficient alone to trigger strict scrutiny the Supreme Court would have been enunciating (and preserving to date) a superfluous element

and an unnecessary doctrine. The *Angel V.* panel interprets the political structure equal protection doctrine to require a showing of discriminatory intent. *Id.* However, discriminatory intent, by itself, triggers strict scrutiny under a conventional equal protection analysis. *See generally Vill. of Arlington Heights*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Under *Angel V.'s* interpretation, then, there would be no need to engage in the political structure analysis when plaintiffs can show purposeful racial discrimination. Thus, the *Angel V.* decision renders the political restructuring element—and the entire political structure equal protection doctrine—superfluous, despite the Supreme Court's lengthy discussion of political restructuring in *Seattle*, 458 U.S. at 474–82, 102 S.Ct. 3187, and this court's treatment of the political structure equal protection doctrine in *CEE*. *CEE*, 122 F.3d at 706.

"Political structure" equal protection analysis does not require a showing of intent to discriminate. The Court in *Seattle* expressly considered and rejected the State of Washington's argument that the intent requirement of other Supreme Court decisions overturned *Hunter*. *Seattle*, 458 U.S. at 484–85, 102 S.Ct. 3187 ("We have not insisted on a particularized inquiry into motivation in all equal protection cases: 'A racial classification, *regardless of purported motivation,* is presumptively invalid and can be upheld only upon extraordinary justification' . . . [and] legislation of the kind challenged in *Hunter* similarly falls into an inherently suspect category.") (citations omitted) (emphasis

---

**6.** This question does not hinge on the subjective value of a particular method for instructing students of limited English proficiency. The "political structure" equal protection violation would stand even if bilingual education replaced "structured English immersion" as

the embedded default policy. If a statute were to have restructured the political process making it more difficult for minorities to enact legislation that is in their interest, the statute would trigger the *Hunter–Seattle* doctrine.

added); *cf. Vill. of Arlington Heights*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; *Washington*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427. The laws in question in *Hunter* and *Seattle* were both facially neutral, and the Supreme Court did not inquire into the Akron, Ohio or the State of Washington voters' intent in finding political structure equal protection violations. The *Angel V.* panel therefore erroneously considered whether there was "evidence that Proposition 227 was motivated by racial animus." *Angel V.*, 307 F.3d at 1040–42.[7]

### IV.

The *Angel V.* panel misconstrues the essence of the "political structure" equal protection doctrine as announced in *Hunter* and *Seattle* and renders it indistinguishable from conventional equal protection analysis by requiring a showing of discriminatory intent. What the Supreme Court announced in *Hunter* and *Seattle*, and what this circuit affirmed in *CEE*, is that a law facially violates equal protection if it *restructures the political process with respect to an issue that has a racial focus.*

For the reasons stated above, I dissent from the denial of rehearing en banc.

---

**7.** The element most resembling an inquiry into intent appears in *Seattle*: "[it] is beyond reasonable dispute, then, that the initiative was enacted 'because of,' not merely 'in spite of,' its adverse effects upon busing for integration." *Seattle*, 458 U.S. at 471, 102 S.Ct. 3187. However, it is clear that the Supreme Court looked to whether the purpose of a law was to affect a minority's political sway with respect to a particular, racially charged *issue*. This is distinct from racial animus. *Cf. Gordon v. Lance*, 403 U.S. at 5, 91 S.Ct. 1889; *Wellwood v. Johnson*, 172 F.3d at 1010.